986 A.2d 84

**COMMONWEALTH of Pennsylvania, Appellee**

**v.**

**Milton MONTALVO, Appellant.**

Supreme Court of Pennsylvania.

Submitted Dec. 2, 2008.

Decided Dec. 28, 2009.

Joanne Tyler–Floyd, for Milton Montalvo.

Christopher D. Carusone, PA Office of Attorney General, Philadelphia, Lori Ann Yost, York County District Attorney's Office, Thomas Kelley, York, and Amy Zapp, Harrisburg, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## OPINION

Justice GREENSPAN.

This is a direct appeal from the imposition of a sentence of death by the Court of Common Pleas of York County, in which

Appellant Milton Montalvo raises thirty-seven (37) issues for our review. We affirm.

## FACTS & PROCEDURAL HISTORY

The record shows that in April of 1998, Appellant, who had recently separated from his wife, Miriam Ascensio, had a telephone conversation with her while he was in a local grocery store. Esther Soto, the owner of that store, was present and later told police in a recorded statement that, after the call, Appellant told his brother, Noel Montalvo, that he would kill his wife. Later that evening, Ascensio and her co-worker, Nelson Lugo (a.k.a. Manuel Santana) were seen together at a local bar. Hours later, two of Ascensio's neighbors heard Appellant outside Ascensio's apartment demanding entry into the premises. Additionally, those witnesses testified that they heard a window break, and heard Ascensio asking for the police to be called. Two other neighbors testified to hearing a disturbance on the porch of Ascensio's apartment. One neighbor saw a Hispanic man banging on Ascensio's door. Witnesses testified that, following the sound of breaking glass, they heard loud noises emanating from the apartment throughout the night.

The next morning, another neighbor noticed broken glass on the back porch near Ascensio's apartment. That neighbor knocked on the door to check on Ascensio, and when he received no response, he pushed a curtain aside and looked inside the apartment. He noticed a male lying on the floor and instructed his wife to call the police. The police found the bodies of Ascensio and Lugo inside the apartment. Ascensio's neck was slashed multiple times and her skull was fractured in multiple places, consistent with multiple blows from a blunt object. Ascensio's neck also had several superficial cuts, and one of her eyes was punctured. Her body was found naked from the waist down, and a high-heeled shoe was placed at her crotch. Lugo had died as a result of a stab wound to the chest. Crime scene investigators collected two blood samples at Ascensio's apartment that matched Appellant: one on a blind

hanging inside a broken pane of glass above the doorknob and another on a cloth bag found on a sofa bed.

Esther Soto told police that Appellant and Noel Montalvo arrived at her home on the morning after the murder. Appellant stated: "[W]e killed my wife." Appellant and Noel Montalvo explained that Appellant killed Lugo and Noel Montalvo killed Ascensio. They asked Soto's husband if they could stay, but were refused. They left forty-five (45) minutes after arriving, stating that they intended to go to Florida or the Dominican Republic. Appellant was apprehended in Miami, Florida in January of 1999.[1]

The Commonwealth charged Appellant with two counts of murder. In January of 2000, Appellant was tried before the Honorable Sheryl A. Dorney and a jury. In addition to the aforementioned blood samples, the Commonwealth presented the testimony of several witnesses to establish Appellant's presence at the crime scene at the time of the murders. The Commonwealth further entered into evidence Esther Soto's tape-recorded statement to police detailing her observations and Appellant's statements that he planned to kill his wife and his admission that he and his brother had done so. On the witness stand, Soto recanted her earlier statement to police, claiming that police threatened to close her business and imprison her if she did not implicate Appellant in the murders. She testified that Appellant never stated in her presence that he would kill his wife, and that Appellant never admitted in her presence to killing Ascensio and Lugo. The Appellant's case-in-chief consisted of calling two character witnesses, who testified to Appellant's law-abiding reputation, and recalling Commonwealth witness Detective Michael Hose for further cross-examination.[2] The Commonwealth argued to the jury

1. Appellant's brother, Noel Montalvo was apprehended years later, tried separately, and convicted by a jury in 2003. This Court has already reviewed and affirmed Noel Montalvo's convictions and sentence of death. *See Commonwealth v. Noel Matos Montalvo*, 598 Pa. 263, 956 A.2d 926 (2008)

2. The brief cross-examination of Detective Hose during Appellant's case-in-chief established that, while at the crime scene, Detective Hose

that Appellant, together with his brother, committed two brutal, premeditated, and deliberate killings. The defense argued that the Commonwealth did not establish beyond a reasonable doubt Appellant's participation in the killings, and that the evidence at best demonstrated that Appellant was present at Ascensio's apartment at some point that evening. After deliberations, the jury found Appellant guilty of both counts of first-degree murder. On January 21, 2000, the jury returned a verdict of death on both murders. The jury found three aggravating circumstances in the murder of Ascensio, and two aggravating circumstances in the murder of Lugo,[3] and determined that these aggravators outweighed the two mitigating circumstances found in each murder.[4]

On February 25, 2000, Appellant, represented by new counsel, filed a notice of appeal with this Court. In April of 2000, pursuant to Pa.R.A.P. 1925(b), Appellant filed a statement of matters complained of on appeal, which included sixteen (16) claims of ineffective assistance of trial counsel. On July 23, 2001, the trial court issued its opinion.

On November 14, 2001, Appellant filed a motion in this Court to remand his case to the trial court for an evidentiary hearing. This Court granted that motion on January 29, 2002.[5] Thereafter, Appellant, yet again represented by new

processed an insurance bill bearing Appellant's name with Ascensio's address.

3. In both murders, the jury found that Appellant committed a killing while in the perpetration of a felony (burglary), 42 Pa.C.S. § 9711(d)(6), and that Appellant had committed multiple murders, *id.* § 9711(d)(11). In the Ascensio murder, the jury also found that the killing was committed by means of torture, *id.* § 9711(d)(8).

4. The mitigating circumstances found by the jury were 1) that Appellant had no significant history of prior criminal convictions, 42 Pa.C.S. § 9711(e)(1), and 2) other evidence of mitigation, *id.* § 9711(e)(8), which included Appellant's prison adjustment record, his education, his ability to be productive, and positive family testimony regarding Appellant's character.

5. As we recently stated: "In *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726, 738 (Pa.2002), this Court held that challenges to counsel's effectiveness should be deferred until collateral review." *Commonwealth v. Clark*, 599 Pa. 204, 961 A.2d 80, 85 (2008). Nevertheless, this Court remanded the case *sub judice* for an evidentiary hearing on

appellate counsel, filed several supplemental motions, including a motion for a new trial and penalty hearing, and an amended motion based on ineffective assistance of counsel. On January 22 and 23, 2004, Judge Dorney conducted an evidentiary hearing on ineffectiveness of trial counsel. On August 16, 2004, Appellant filed a motion for a new trial based on after-discovered evidence. On October 5, 2005, and November 9, 2005, Judge Dorney conducted an additional evidentiary hearing regarding that motion. On June 28, 2006, Judge Dorney issued an opinion and order denying all thirty-seven (37) claims raised by Appellant. Appellant thereafter appealed to this Court. We address, respectively, Appellant's seventeen (17) claims on direct appeal in addition to his twenty (20) claims of ineffective assistance of counsel.

## DISCUSSION

### I. *Sufficiency of the evidence*

Appellant does not raise a specific claim that the evidence at trial was insufficient to support his conviction. In cases where a death sentence has been imposed, however, this Court conducts an independent review of the record to determine whether the evidence adduced at trial was sufficient to sustain a first-degree murder conviction. *Commonwealth v. Ramos*, 573 Pa. 605, 827 A.2d 1195, 1196 (2003). As we have previously stated:

> To obtain a first-degree murder conviction, the Commonwealth must demonstrate that a human being was unlawfully killed, the defendant perpetrated the killing, and the defendant acted with malice and a specific intent to kill. When reviewing whether the evidence was sufficient to support a jury's findings to this effect, this Court deter-

ineffectiveness before the decision in *Grant*. This Court has recognized a limited exception to the *Grant* rule, which allows this Court to address claims of trial counsel's ineffectiveness on direct review where—as here—there has been a hearing in the trial court on ineffectiveness and where the trial court has issued an opinion addressing those claims. *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 853–55 (2003). Consequently, Appellant's claims of ineffectiveness are properly before us now.

mines whether the evidence, viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to enable a reasonable jury to find every element of the crime beyond a reasonable doubt. In applying this standard, we bear in mind that the Commonwealth may sustain its burden by means of wholly circumstantial evidence; that the entire trial record should be evaluated and all evidence received considered, whether or not the trial court's rulings thereon were correct; and that the trier of fact, while passing upon the credibility of witnesses and the weight of the proof, is free to believe all, part, or none of the evidence.

*Commonwealth v. Kennedy,* 598 Pa. 621, 959 A.2d 916, 920 (2008) (internal citations omitted).

■ As described above, the evidence demonstrated that shortly before the murders Appellant stated his intent to kill his wife. Appellant was then seen demanding entry into Ascensio's apartment the night of the murder. Two blood samples confirm Appellant's presence in the apartment. Appellant also admitted responsibility for the murders the next morning in the presence of Esther Soto. Taking these facts along with other pieces of evidence into account, we conclude that the record at trial was more than sufficient for the jury to conclude, beyond a reasonable doubt, that Appellant was guilty of two premeditated and deliberate killings.

## II. *Voir dire*

■ Appellant argues that the trial court erred in permitting a *voir dire* question requested by the Commonwealth regarding circumstantial evidence. According to Appellant, the trial court "effectively permit[ted] the Commonwealth to test the waters of how a juror would react to [the] evidence." Appellant's Brief at 9.

During *voir dire,* the trial court stated in pertinent part:

There are two types of evidence in a case. There is direct evidence and there is what we call circumstantial evidence.

Direct evidence is what we all saw at noon and that was it was raining. You saw it rain. At least I hope you saw it rain. But it was raining at noon.

Circumstantial evidence would be if you were in a room and [sic] didn't have any windows today and you walk out at the end of the day at 4:30, or whatever time before that we adjourn for the night, and you see people carrying umbrellas, you see people wearing raincoats, streets are wet, there is [sic] puddles along the gutter, along the sidewalk, cars have droplets of water on it, but it's not actually raining, that is all circumstantial evidence, facts that lead to the conclusion that it had rained.

It was not direct evidence. You did not see it rain, but there are all of these other facts that lead you to the conclusion that it rained when I was in that courthouse today. Okay.

Does anyone have any reservations or doubts about accepting the fact that a Defendant's guilt can be established solely by circumstantial evidence? And I will instruct you that the guilt of a Defendant may be established by circumstantial evidence alone but only if certain factors are met by the Commonwealth. Does anybody have a problem following the Court's instruction concerning circumstantial evidence?

N.T., 01/10/2000, 109.

"The purpose of *voir dire* is to ensure the empanelling of a fair and impartial jury capable of following the instructions of the trial court." *Commonwealth v. Chmiel,* 585 Pa. 547, 889 A.2d 501, 520 (2005) (quoting *Commonwealth v. Harvey Miguel Robinson,* 581 Pa. 154, 864 A.2d 460, 484 (2004)). This Court has consistently held that the "scope of the *voir dire* rests in the sound discretion of the trial judge, whose decision will not be reversed unless palpable error is established." *Id.* We find no merit in Appellant's claim. The trial court's question here simply asked if the jurors were capable of following that court's instructions. We conclude that the trial court did not abuse its discretion in asking the jury this question.

### III. *Opening statements*

■ Appellant argues that the trial court committed error when it overruled his objection to the Commonwealth's opening statement that Ascensio was "butchered." Appellant contends that the Commonwealth's statement was intended to "arouse passion against [Appellant] and sympathy for Ascensio." Appellant's Brief at 10.

This Court considered the propriety of a prosecutor's opening remarks in *Commonwealth v. Antyane Robinson*, 583 Pa. 358, 877 A.2d 433 (2005), where this Court stated:

> A prosecutor's remarks are fair if they are supported by evidence or contain inferences reasonably derived from that evidence. *Commonwealth v. [Darryl John] Carter*, 537 Pa. 233, 643 A.2d 61, 75 (1994). "Prosecutorial misconduct does not occur unless the unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict." *Commonwealth v. Paddy*, 569 Pa. 47, 800 A.2d 294, 316 (2002) (citing *Commonwealth v. Rizzuto*, 566 Pa. 40, 777 A.2d 1069 (2001)). Due to the nature of a criminal trial, both sides must be allowed reasonable latitude in presenting their cases to the jury. A prosecutor's comments must be reviewed in the context in which they were made. *Commonwealth v. Smith*, 490 Pa. 380, 416 A.2d 986, 989 (1980).

*Id.* at 441 (parallel citations omitted). In this case, the trial court instructed the jury that counsel's remarks were not evidence, and that Appellant was presumed innocent. We conclude that the Commonwealth's use of a single word, which was subsequently substantiated by ample evidence at trial,[6] did not prejudice Appellant such that the jury could not fairly reach a verdict.

---

**6.** As described in Part IX, the guilt phase testimony of the Commonwealth's pathologist, Dr. Sarah L. Funke, demonstrated that Ascensio suffered multiple incised wounds to her neck, which severed her jugular veins and her carotid artery on one side and fractured her spine. *See, infra*, Op. at 429, 986 A.2d at 110.

## IV. *Admission of evidence*

Appellant raises eight (8) issues challenging the trial court's admission or exclusion of evidence. These claims encompass evidentiary rulings made during both the guilt and penalty phases of trial. We address the guilt phase claims first, before turning to the penalty phase claims.

Our standard of review for considering whether a ruling on the admissibility of evidence was proper is well settled:

Admission of evidence is a matter within the sound discretion of the trial court, and will not be reversed absent a showing that the trial court clearly abused its discretion. *Commonwealth v. Chmiel*, 558 Pa. 478, 738 A.2d 406, 414 (1999). Not merely an error in judgment, an abuse of discretion occurs when "the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence on record." *Commonwealth v. McAleer*, 561 Pa. 129, 748 A.2d 670 (2000).

*Commonwealth v. Cooper*, 596 Pa. 119, 941 A.2d 655, 668 (2007) (parallel citations omitted).

First, Appellant argues that the trial court erred when it denied his motion in limine to exclude a knife and axe found in Appellant's van subsequent to Appellant's arrest. Appellant argues that, under Pa.R.E. 403, the probative value of these items was outweighed by their prejudicial effect. Appellant emphasizes that the knife was not unusual, that the axe was in fact being used to support the driver's seat, and that no blood was found on either item. The trial court denied Appellant's motion in limine after the Commonwealth proffered that its pathologist, Dr. Sarah L. Funke, would testify that the knife and axe were consistent with the type of implements that caused Ascensio's injuries. *See* N.T., 01/10/2000, at 24–25.

In *Commonwealth v. Williams*, 537 Pa. 1, 640 A.2d 1251 (1994), this Court held:

A weapon shown to have been in a defendant's possession may properly be admitted into evidence, even though it cannot positively be identified as the weapon used in the

commission of a particular crime, if it tends to prove that the defendant had a weapon similar to the one used in the perpetration of the crime. Any uncertainty that the weapon is the actual weapon used in the crime goes to the weight of such evidence.

*Id.* at 1260 (citing *Commonwealth v. Coccioletti*, 493 Pa. 103, 425 A.2d 387 (1981)). A straightforward application of the rule in *Williams* reveals the inherent probative value of the items admitted into evidence. Therefore, the trial court did not abuse its discretion in denying Appellant's motion in limine.[7]

■ Second, Appellant contends that the trial court erred in permitting the Commonwealth's expert on serology and trace evidence, Chris Anne Arrotti, to testify "about why there would be no seminal fluid concerning Ascensio." Appellant's Brief at 11. Before this Court, Appellant basically asserts Arrotti's testimony was more prejudicial than probative, as it "allowed the jury to speculate that the victim may have been raped." *Id.*

At trial, Arrotti testified that swabs taken from Ascensio's body showed no evidence of semen. N.T. 01/18/2000, 1014–15. When the Commonwealth followed up by asking what could account for the absence of seminal fluid, Appellant's trial counsel objected on the basis that "[a]ccounting for a negative . . . is not possible." *Id.* at 1015. The trial court overruled that objection. Arrotti went on to explain that the absence of such material could indicate "no sexual activity, no penetration, no ejaculation, or use of a condom." *Id.*

7. The trial court notes that—despite the Commonwealth's proffer during pretrial motions that Dr. Funke would testify that Ascensio's injuries were consistent with the use of an axe—such testimony never occurred. Trial Court Opinion, dated June 28, 2006, at 8–9 n. 1. Indeed, our review of the record confirms that Dr. Funke's testimony did not address the axe, which was admitted earlier in the trial through the testimony of Detective Hose of the York Police Department. We note, however, that Appellant here has only challenged the trial court's pretrial ruling denying the motion in limine, which the trial court was well within its discretion to deny in light of the Commonwealth's proffer and this Court's decision in *Williams*.

Appellant's contention that this testimony is improper is not supported by our prior decisions. This Court has held that an expert may respond to a hypothetical with an opinion so long as the operative set of facts is eventually supported by competent evidence. *Commonwealth v. Rollins*, 558 Pa. 532, 738 A.2d 435, 446 (1999) (citing *Commonwealth v. LaCava*, 542 Pa. 160, 666 A.2d 221, 236 (1995)). In the case *sub judice*, testimony established that Ascensio's body was found naked from the waist down, and that a high-heeled shoe was placed at her crotch. Further, Soto's tape-recorded statement indicated that Noel Montalvo admitted to having sexual relations with Ascensio. We also note that Arrotti in fact expressed no singular opinion as to what occurred. Rather, the witness simply explained four possible scenarios that could account for the lack of semen evidence. Consequently, we conclude that the trial court properly admitted Arrotti's testimony.

■ Third, Appellant argues that the trial court erred in overruling his objection to Detective Roland Camacho's testimony that Esther Soto "had intimate knowledge of the case and ... knew things the newspapers did not know." Appellant's Brief at 11. Appellant bases his claim on the theory that Detective Camacho's statement improperly bolstered Soto's tape-recorded statement, which was subsequently played for the jury.

■ Improper bolstering of a witness's testimony occurs when the prosecutor assures the jury that a witness is credible when such assurance is based on information not contained in the record. *Commonwealth v. Cousar*, 593 Pa. 204, 928 A.2d 1025, 1041 (2007). This Court has repeatedly held, however, that statements explaining a police officer's conduct during the course of an investigation are admissible. *See, e.g., Chmiel, supra*, 889 A.2d at 532–34. When exercising discretion over the admission of such statements, the trial court is required to balance the Commonwealth's need for the statements with any prejudice arising therefrom. *See Commonwealth v. Jones*, 540 Pa. 442, 658 A.2d 746, 751 (1995) (citing *Commonwealth v. Yates*, 531 Pa. 373, 613 A.2d 542, 543 (1992)).

Here, the testimony at issue was given during the Commonwealth's direct examination of Detective Camacho, who had tape-recorded Soto's statement to police. Earlier at trial, Soto had recanted her statement, claiming that Detective Camacho had coerced her. The Commonwealth's line of questioning at the time of the testimony at issue, which led to the Commonwealth's playing the recording for the jury, centered on the circumstances surrounding the conversation between Esther Soto and Detective Camacho, and his recording of her statement. In this case, the course of Detective Camacho's conduct in obtaining Soto's statement, which was specifically at issue after she testified, was of great import. As a result, we conclude that the trial court was well within its discretion to admit Detective Camacho's testimony.

■ Fourth, Appellant challenges the trial court's refusal to permit defense investigator Charles Kleber from testifying that Soto told him she was threatened by police. As previously mentioned, Soto claimed that she gave her tape-recorded statement only after being threatened by Detective Camacho. During the defense case-in-chief, trial counsel attempted to examine Kleber, a defense investigator to whom Soto allegedly reported Detective Camacho's threats. The Commonwealth objected and, at sidebar, requested an offer of proof. Trial counsel responded that Kleber was being called solely "[t]o testify that [Soto] reported to him that she was threatened by Detective Camacho." N.T., 01/19/2000, 1144. The trial court sustained the Commonwealth's objection. In essence, Appellant argues that Kleber's testimony should have been admitted as evidence of a prior consistent statement.

The Pennsylvania Rules of Evidence provide, in pertinent part:

Rule 613. Prior statements of witnesses

* * *

(c) Evidence of prior consistent statement of witness. Evidence of a prior consistent statement by a witness is admissible for rehabilitation purposes if the opposing party is given an opportunity to cross-examine the witness about the

statement, and the statement is offered to rebut an express or implied charge of:

(1) fabrication, bias, improper influence or motive, or faulty memory and the statement was made before that which has been charged existed or arose; or

(2) having made a prior inconsistent statement, which the witness has denied or explained, and the consistent statement supports the witness' denial or explanation.

Pa.R.E. 613(c). When considering the admissibility of prior statements, the importance of timing has often been emphasized. *See, e.g., Commonwealth v. Hutchinson,* 521 Pa. 482, 556 A.2d 370 (1989) (requiring that, to be admissible, a prior statement must have been made before any corrupt motive has arisen). *See also* Pa.R.E. 613(c) comment ("When the witness admits and explains the inconsistent statement, the use of the consistent statement will depend upon the nature of the explanation and all of the circumstances that prompted the making of the consistent statement; the timing of that statement, although not conclusive, is one of the factors to be considered.").

At sidebar, trial counsel failed to provide the timing of Soto's statement to Kleber, and additionally failed to provide any of the circumstances surrounding Soto's prior consistent statement. Therefore, at the time of the trial court's ruling, the only facts available for consideration were that Soto told an investigator-hired by Appellant's trial counsel—that the police had threatened her. Under these circumstances, we conclude that the trial court did not abuse its discretion in excluding Kleber's testimony.

Fifth, Appellant asserts that the trial court erred during the guilt phase when it prohibited testimony that he had no criminal record. During the cross-examination of Detective Hose, trial counsel asked the witness to describe the items seized from the vehicle in Miami. N.T., 01/14/2000, 814. Detective Hose listed several items, including a "certified record for criminal history belonging to [Appellant]." *Id.* at 815. Although Appellant had no prior criminal history, trial

counsel did not clarify that the document established that fact at the time. Rather, trial counsel sought to recall Detective Hose to the stand during its case-in-chief. The Commonwealth objected on the basis that trial counsel's delay was unreasonable and that admission of Detective Hose's testimony at that time would constitute improper character testimony. The trial court sustained the Commonwealth's objection.

This Court has held: "Not all references which may indicate prior criminal activity require reversal. Mere passing references to criminal activity will not require reversal unless the record indicates that prejudice resulted from the reference." *Commonwealth v. Blystone*, 555 Pa. 565, 725 A.2d 1197, 1204–05 (1999) (citing *Commonwealth v. Nichols*, 485 Pa. 1, 400 A.2d 1281, 1282 (1979)). We conclude that a lone reference to this document, without any further explanation, was not so prejudicial as to warrant relief. We note that during his case-in-chief, Appellant called character witnesses establishing his law-abiding reputation. Moreover, the trial court instructed the jury: "The law recognizes that a person of good character is not likely to commit a crime which is contrary to that person's nature. Evidence of good character made [sic] by itself raises [sic] a reasonable doubt of guilt and requires a verdict of not guilty." N.T., 01/20/2000, 1241. Hence, the jury was expressly told, without any rebuttal, that Appellant was law-abiding. Accordingly, this lone reference, to which trial counsel opened the door by his own cross-examination of Detective Hose, is plainly harmless.

We now address the first of Appellant's three evidentiary claims arising out of the penalty phase of trial. Appellant argues that it was error to prohibit testimony about the criminal background of Appellant's accomplice and co-actor, Noel Montalvo. Specifically, Appellant contends that this evidence, which counsel unsuccessfully attempted to introduce through the testimony of Appellant's and Noel Montalvo's mother, was relevant for the jury's determination of mitigating circumstances relating to Appellant's role in and the circumstances of the offense. 42 Pa.C.S. § 9711(e)(7), (8).

Evidence is relevant only if it tends to make "the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa.R.E. 401. Moreover, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." *Id.* at 404(b)(1). Absent additional evidence, the mere fact that Noel Montalvo had a criminal record does not tend to establish that Appellant's participation in the homicidal act was relatively minor. Nor does Noel Montalvo's criminal history reveal anything regarding the circumstances of the offense or that Appellant was or was not a guilty party in addition to his brother. The criminal record of an accomplice alone is simply not relevant to a defendant's guilt or innocence. Accordingly, because the introduction of Noel Montalvo's criminal record would not have served any relevant purpose, we hold that the trial court properly excluded this evidence.[8]

■ Next, we address Appellant's claim that the trial court erred in permitting a photograph of Ascensio's body to be identified and described, though not actually published to the jury, during the penalty phase. Appellant argues that the photograph was inflammatory, and that its probative value was outweighed by its prejudicial effect. This Court has previously noted that victim photographs are "clearly relevant to establish the aggravating circumstance of 'torture.'" *Harvey Miguel Robinson,* 864 A.2d at 508 (citing *Commonwealth v. Brown,* 567 Pa. 272, 786 A.2d 961, 971 (2001) (finding that approximately life-size slides of the victim were "highly probative of [the] intent to inflict unnecessary pain or suffering and that [the killing was done] in a manner or means that are heinous, atrocious, or cruel, or show exceptional depravity"), *cert. denied,* 537 U.S. 1187, 123 S.Ct. 1351, 154 L.Ed.2d 1018

8. Appellant, later in his brief, also claims that trial counsel was ineffective during the guilt phase for failing to properly authenticate and lay a foundation for a document describing Noel Montalvo's criminal history. For the reasons stated above, and as also discussed *infra,* Op. at 423–24, 986 A.2d at 106–07, any claim regarding the denial of admission of Noel Montalvo's criminal record is meritless.

(2003)). Nevertheless, the record indicates that the trial court greatly limited the Commonwealth's use of the photograph. The trial court ruled that the Commonwealth's witnesses could use the photograph, which was taken after Ascensio's body had been repositioned, only to describe the condition of the body when found at the crime scene, and expressly prohibited the Commonwealth from showing the photograph to the jury. N.T., 01/20/2000, 17. Ultimately, the photograph was described by Detective Hose, who testified to the similarities and differences between the condition of Ascensio's body as depicted in the photograph and how her body was first found at the crime scene. Certainly, the condition of Ascensio's body was both relevant and probative. Further, given the strict limitations imposed by the trial court, Detective Hose's description of the photograph was probative and not unduly prejudicial. Accordingly, we conclude that the trial court properly allowed the testimony describing the photograph to the jury.

Finally, Appellant claims that it was error for the trial court, during the penalty phase, to exclude testimony from four witnesses "in the form of a request ... to spare [Appellant's] life." Appellant's Brief at 14. Appellant's position is that "[t]he fact that 4 people could have asked the jury to spare [his] life [goes] directly to his character." *Id.* at 15. Our case law, however, is at odds with Appellant's contention. We recently discussed the role of mercy in capital cases:

> Strictly speaking, a finding of "mercy" unmoored from a specific statutory mitigator should not trigger a capital jury's weighing process. The "catchall" mitigator in the capital sentencing scheme only permits a jury to consider "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of the offense." 42 Pa.C.S. § 9711(e)(8) (emphasis added). We have previously held, for example, that the testimony of a victim's mother regarding her personal opposition to the death penalty was inadmissible as a mitigating factor because the personal beliefs of a victim's family member do not fall within this definition. *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 852 (2003).

*Similarly, "mercy," as a stand-alone factor, is not a characteristic of the defendant or a circumstance of the crime, and thus does not fall within the catchall mitigator or any other specific mitigator.* Of course, a jury may consider mercy or sympathy when weighing specific aggravating and mitigating factors, but it may not exercise its sense of mercy or sympathy in a vacuum. By the same token, appellant was entitled to present and argue any evidence that was relevant and admissible to statutory mitigators in his attempt to convince the jury to exercise its mercy or sympathy and return a life sentence. But the jury must correspondingly bottom any such exercise of mercy or sympathy on the evidence of specific mitigators. *See Commonwealth v. Rainey,* 540 Pa. 220, 656 A.2d 1326, 1334 (1995) (citing *Commonwealth v. Zook,* 532 Pa. 79, 615 A.2d 1, 13 (1992)). This rule is essential to avoid arbitrariness in sentencing, as "[i]n the absence of a standard to guide the jury's expression of mercy and leniency, there would be no guarantee of consistency in sentencing across cases." *Rainey,* 656 A.2d at 1333 (internal quotation marks omitted).

*Commonwealth v. Powell,* 598 Pa. 224, 956 A.2d 406, 426–27 (2008) (emphasis added) (parallel citations omitted). Our review of the record reveals that Appellant presented no evidence that would link mercy to any of the mitigating circumstances for which he presented evidence. Further, nothing in our case law demonstrates the relevance of a witness's desire that the jury exercise mercy. We consequently find no error in the trial court's refusal to allow defense witnesses to testify only for purposes of requesting that the jury spare Appellant's life.

## V. *Jury instructions*

In three claims, Appellant asserts the trial court erred in failing to grant his requests for particular jury charges at both the guilt and penalty phases of trial. At the outset, we set forth our standard of review:

It is established that appellate review of a trial court charge must involve a consideration of the charge as a whole to

determine whether it was fair and complete. The review does not focus upon whether certain "magic words" were included in the charge. Rather, it is the effect of the charge as a whole that is controlling.

*Commonwealth v. Saunders,* 529 Pa. 140, 602 A.2d 816, 818 (1992) (citing *Commonwealth v. Ohle,* 503 Pa. 566, 470 A.2d 61, 70 (1983)). *See also Commonwealth v. Hawkins,* 567 Pa. 310, 787 A.2d 292, 301 (2001) ("When evaluating jury instructions, the charge must be read as a whole to determine whether it was fair or prejudicial. The trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration.").

██ First, Appellant argues that, during the guilt phase, the trial court erred by refusing his requested charge on inconsistent inferences in accordance with this Court's decision in *Commonwealth v. Tribble,* 502 Pa. 619, 467 A.2d 1130 (1983). The pertinent language in *Tribble,* upon which Appellant relies, originated in this Court's decision in *Commonwealth v. New:* "When two equally reasonable and mutually inconsistent inferences can be drawn from the same set of circumstances, a jury must not be permitted to guess which inference it will adopt, especially when one of the two guesses may result in depriving a defendant of his life or his liberty." 354 Pa. 188, 47 A.2d 450, 468 (1946). Appellant's position is the Commonwealth's evidence was consistent with his defense theory, namely that Appellant "did not commit the crime, although he may have been present at some point." Appellant's Brief at 13.

In *Tribble,* this Court reversed a defendant's conviction for theft of movable personal property. Tribble, a former employee of a trucking company, was connected by fingerprints to three trucks that were stolen two months after the termination of his employment. The fingerprint expert in that case testified that 1) he could not determine how old the fingerprints were, and 2) it was possible for the fingerprints to have remained on the truck for two months. Further, the record established that Tribble had frequent contact with the stolen

trucks during his employment. Under these circumstances, this Court concluded that that evidence was equally consistent with an inference that Tribble left the fingerprints during his employment. Consequently, this Court held that the evidence was insufficient to prove Tribble's guilt beyond a reasonable doubt.

Here, we conclude that the evidence of guilt does not equally support an inference that Appellant was a non-participant in the crimes. Appellant announced his intent to kill his wife hours prior to her death. Witnesses heard Appellant demanding entry to Ascensio's apartment moments before hearing breaking glass and Ascensio's request for the police. Moreover, Appellant's blood was found in two separate locations in the apartment, including on a blind hanging inside a pane of broken glass. Finally, Appellant admitted to killing his wife the morning after the murder and fled the jurisdiction. On its face, this evidence plainly contradicts Appellant's defense theory. An inference that Appellant did not participate in these crimes is not equal to the inference that Appellant committed these murders.

 Second, Appellant contends that the trial court erred during the guilt phase by not instructing the jury on voluntary manslaughter. This Court has "repeatedly held that a voluntary manslaughter instruction is warranted only where the offense is at issue and the evidence would support such a verdict." *Commonwealth v. Ragan*, 560 Pa. 106, 743 A.2d 390, 396 (1999) (citing *Antyane Robinson*, 721 A.2d at 353–54; *Commonwealth v. Speight*, 544 Pa. 451, 677 A.2d 317, 324–25 (1996), *cert. denied*, 519 U.S. 1119, 117 S.Ct. 967, 136 L.Ed.2d 852 (1997); *Commonwealth v. Browdie*, 543 Pa. 337, 671 A.2d 668, 673–74 (1996); *Williams*, 640 A.2d at 1265–66; *Commonwealth v. Charles Carter*, 502 Pa. 433, 466 A.2d 1328, 1332–33 (1983)). To support a verdict for voluntary manslaughter, the evidence would have had to demonstrate that, at the time of the killing, Appellant acted under a sudden and intense passion resulting from *serious provocation* by the victim. 18 Pa.C.S. § 2503(a). "The ultimate test for adequate provocation remains whether a reasonable man, confronted with this

series of events, became impassioned to the extent that his mind was incapable of cool reflection." *Commonwealth v. Thornton,* 494 Pa. 260, 431 A.2d 248, 252 (1981).

The only evidence Appellant relies upon to support his claim is the testimony of "witnesses [who] heard [Appellant] yelling at Ascensio's door to let him in because he knew she was with another man." Appellant's Brief at 14. Ascensio's neighbors, Yocelyn Gomez and Fidelio Morrell, testified at trial that they heard Appellant at Ascensio's door demanding entry and claiming that he saw someone else in the apartment. N.T., 01/13/2000, 486, 516. According to Appellant, this evidence would have supported a jury's determination that the murder occurred as a result of "jealousy prompting rage." Appellant's Brief at 14. We find no merit to Appellant's argument. In our view, this testimony—that Appellant believed Ascensio was in her apartment with another person—was not sufficient, standing alone, for a jury to reasonably conclude that Appellant was seriously provoked. The record does not support an inference that Appellant knew that his wife was involved with another man, let alone an inference that Appellant came upon them in their extramarital relationship, in a manner and at a time that rendered him incapable of cool reflection. Consequently, we conclude that the trial court did not abuse its discretion in refusing a charge on voluntary manslaughter.

Third, Appellant claims that, during the penalty phase, "it was error to refuse the request to charge as a mitigating circumstance that [Appellant's] participation in the killing of Ascensio was relatively minor." Appellant's Brief at 15. We see no merit in this claim. Although relatively minor participation in a homicidal act is an enumerated mitigating offense, 42 Pa.C.S. § 9711(e)(7), Appellant presented no evidence that warranted this charge. Esther Soto's statement that Noel Montalvo admitted killing Ascensio while Appellant dispatched Lugo does not on its own establish that Appellant's role was minor; rather, this statement merely demonstrates that *Noel Montalvo's* role was not minor. Indeed, the same statement upon which Appellant now relies as evidence of his minor role in the killing of Ascensio also established that it

was Appellant who wanted Ascensio dead and stated, "[W]e killed my wife." We conclude, therefore, that the record did not warrant a charge that Appellant's role in Ascensio's murder was relatively minor, and the trial court did not abuse its discretion in failing to present the jury with the requested mitigating circumstance.[9]

## VI. *Motion for recusal*

Appellant asserts that it was error for the trial court to deny his motion for recusal at the post-sentence evidentiary hearing. Appellant contends that because the prosecutor in the guilt and penalty phases of trial had subsequently become a judge on the Court of Common Pleas of York County, the trial judge should have granted his motion.

This Court recently discussed the standards governing recusal:

"[A] trial judge should recuse himself whenever he has any doubt as to his ability to preside impartially in a criminal case or whenever he believes his impartiality can be reasonably questioned." *Commonwealth v. Goodman,* 454 Pa. 358, 311 A.2d 652, 654 (1973). It is presumed that the judge has the ability to determine whether he will be able to rule impartially and without prejudice, and his assessment is personal, unreviewable, and final. *Commonwealth v. Druce,* 577 Pa. 581, 848 A.2d 104, 108 (2004). "Where a jurist rules that he or she can hear and dispose of a case fairly and without prejudice, that decision will not be overturned on appeal but for an abuse of discretion." *Commonwealth v. Abu–Jamal,* 553 Pa. 485, 720 A.2d 79, 89 (1998).

*Commonwealth v. Blakeney,* 596 Pa. 510, 946 A.2d 645, 662 (2008) (alteration in original) (parallel citations omitted). Moreover, the party requesting recusal bears the burden of producing evidence that establishes bias, prejudice, or unfair-

9. Moreover, we note that the trial court did instruct the jury that they could consider "any other evidence of mitigation concerning the character and record of the Defendant *and the circumstances of this offense,* including but not limited to his good work and prison adjustment record." N.T., 01/21/2000, 163–65 (emphasis added).

ness. *Commonwealth v. White*, 589 Pa. 642, 910 A.2d 648, 657 (2006). This evidence must raise a substantial doubt as to the jurist's ability to preside impartially. *Id.*

Appellant has failed to meet his burden. The lone fact that the prosecutor during Appellant's trial had become, by the time of Appellant's evidentiary hearing, a judge of the Court of Common Pleas of York County is insufficient to require the recusal of a different judge of the same county. *See, e.g., Commonwealth v. Roger Buehl*, 540 Pa. 493, 658 A.2d 771, 781–82 (1995) (rejecting a similar claim). Therefore, we conclude that the trial court did not abuse its discretion by denying Appellant's motion for recusal.

## VII. Ineffective assistance of counsel

Appellant asserts twenty (20) claims of ineffective assistance of trial counsel.[10] These claims allege ineffectiveness at both the guilt and penalty phases of Appellant's trial. We begin by reciting our standard of review.

Appellate courts presume that trial counsel was effective. *Commonwealth v. Fowler*, 550 Pa. 152, 703 A.2d 1027, 1028 (1997). To rebut this presumption, Appellant must demonstrate that: 1) the underlying claim is of arguable merit; 2) counsel had no reasonable strategic basis for his or her action or inaction; and 3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different. *See Commonwealth v. Meadows*, 567 Pa. 344, 787 A.2d 312, 319 (2001). Petitioner bears the burden of proving all three prongs of the test. *Id.* at 319–20.

All of Appellant's claims of ineffective assistance fail to meet at least one of the three prongs. We address the claims in the general order raised by Appellant.

### A. Character Evidence

Appellant first argues that his trial counsel was ineffective for failing to investigate and introduce evidence that

10. Although Appellant technically raises twenty-one claims of ineffective assistance, two of Appellant's claims are identical.

Appellant had a reputation as a peaceful person. Appellant directs our attention to this Court's decision in *Commonwealth v. Weiss*, 530 Pa. 1, 606 A.2d 439, 442–43 (1992), to support his contention that trial counsel's failure to present evidence on Appellant's peaceful reputation constitutes ineffective assistance. At both the guilt and penalty phases, Appellant's trial counsel called John Ziegler and Patricia Ziegler, each of whom testified to Appellant's reputation as a law-abiding citizen. At the penalty phase of the trial, Appellant's counsel also called Edward Gentzler, who testified to his belief that Appellant could lead a productive life in prison. Consequently, the Commonwealth argues that no prejudice resulted from trial counsel's introduction of character testimony that did not *specifically* include testimony regarding Appellant's *peaceful* nature.

In *Weiss*, this Court considered whether trial counsel was ineffective for failing to call *any* character witnesses. Testimony at an evidentiary hearing demonstrated that trial counsel failed to contact many of the potential character witnesses Weiss had indicated his attorney should contact. Moreover, Weiss's trial counsel failed to contact any witnesses until the day before trial and neither responded to Weiss's inquiries regarding the absence of these witnesses nor consulted with Weiss about his ultimate decision to forego character testimony. Under these circumstances, this Court held that Weiss's trial counsel had no reasonable basis for his numerous failures relating to character witnesses and that, having no witnesses testify to his character whatsoever, Weiss suffered prejudice.

In the instant case, we conclude that Appellant was not prejudiced by trial counsel's actions. It is well established that, to demonstrate prejudice, a defendant must show that an alternative strategy "not selected by counsel offered a substantially greater chance of success than the tactic chosen." *Weiss*, 606 A.2d at 443 (citing *Commonwealth v. Saxton*, 516 Pa. 196, 532 A.2d 352 (1987)). Although Appellant established at the evidentiary hearing that each of these three witnesses would have been willing to testify to his peaceful nature, Appellant cannot demonstrate that this additional character

testimony would have offered a substantially greater chance of success than testimony addressing only his law-abiding reputation and ability to lead a productive life in prison. Indeed, we view the evidence presented by trial counsel regarding Appellant's "law-abiding" reputation as sufficient to address his reputation for peacefulness and non-violence. As a result, we hold that counsel was not ineffective in this regard.

■ Appellant next argues that trial counsel was ineffective during the penalty phase of the trial for failing to request a charge that "good character evidence can be a mitigating circumstance and that alone can justify a life sentence." Appellant's Brief at 18. At trial counsel's request, however, the trial court instructed the jury as follows:

> Your verdict must be a sentence of death if you unanimously find; that is, all of you find at least one aggravating and no mitigating circumstances or if you unanimously find one or more aggravating circumstances which outweigh any mitigating circumstances.

> And again, as defense counsel had indicated—or the Commonwealth had indicated, this does not deal with the number of circumstances on either side. It is by the weight of those circumstances.

> * * *

> In this case, under the sentencing code, the following matters, if proven to your satisfaction by a preponderance of the evidence, can be mitigating circumstances:

> First is that the Defendant has no significant history of prior criminal convictions; second, that the Defendant has a good reputation for being a law abiding citizen; third is any other evidence of mitigation concerning the character and record of the Defendant and the circumstances of this offense, including but not limited to his good work and prison adjustment record.

N.T., 01/21/2000, 163–65. In our view, the requested—and subsequently granted—jury instruction demonstrates that trial counsel effectively advocated on Appellant's behalf and ensured that the jury was instructed to consider Appellant's

character as a mitigating circumstance. Further, assuming *arguendo* that trial counsel requested the precise charge Appellant now claims should have been requested, Appellant cannot demonstrate that such a charge offered a substantially greater chance of success than the charge trial counsel actually requested and the trial court granted. *See Weiss, supra.* Accordingly, trial counsel was not ineffective on this basis.

### B. Appellant's Relationship with Ascensio

 Appellant next asserts that trial counsel was ineffective for failing to introduce evidence that Appellant had a good relationship with Ascensio. Appellant contends that such evidence would have cast doubt upon the Commonwealth's theory of motive to commit murder and that counsel had no reasonable basis for failing to introduce this evidence. The record, however, does not support Appellant's contention. During the evidentiary hearing, trial counsel testified that he intentionally chose not to pursue this strategy because introduction of this evidence would open the door, permitting the Commonwealth to introduce damaging evidence regarding difficulties in Appellant's and Ascensio's relationship around the time of the murders. Consequently, trial counsel had a reasonable basis for deciding not to make Appellant's relationship with Ascensio an issue in the case, and was not ineffective on this basis.

### C. Detective Hose's Testimony

 Appellant also argues that trial counsel was ineffective during the penalty phase of trial for failing to object to "the opinions of Detective Hose ... regarding the extent and nature of the wounds to Ascensio and Lugo because the witness was not qualified to render such opinions nor were there foundations for such testimony." Appellant's Brief at 19. Appellant argues that, during the penalty phase, Detective Hose was able to offer several opinions on the manner in which Ascensio and Lugo died without being qualified by the trial court as an expert. Appellant points to Detective Hose's testimony that: 1) blood covering Ascensio's undergarments

was indicative that the cloth was "grinded [sic] into her face," N.T. 01/20/2000, 28–29; 2) "It was a very, very violent scene," *id.* at 29; and 3) "she did not die a quick death," *id.* Also, Detective Hose testified that the position in which he found Ascensio was "a staged position. She did not—she wasn't— she didn't die like that after the struggle had occurred." *Id.* at 31.

Detective Hose's testimony that Ascensio's undergarments were ground into her face, that the scene was very violent, and that Ascensio did not die a quick death were not unduly prejudicial. As described above, the proper evidence provided by Dr. Funke was far more damaging than Detective Hose's brief comments. Dr. Funke testified at great length during both the guilt and penalty phases of trial that Ascensio's injuries were indicative of a long, drawn-out attack intended to inflict substantial amounts of pain. This testimony alone was sufficient for the jury to find torture as an aggravating circumstance. Therefore, even if Appellant's claim had merit and trial counsel had no reasonable basis for his failure to object, we hold that Appellant cannot satisfy the prejudice prong of the ineffectiveness test because no reasonable probability exists that the outcome of the penalty phase would have been different but for this testimony.

Further, we find no merit in Appellant's claim regarding counsel's failure to object to Detective Hose's testimony that Ascensio's body was in a "staged position" at the penalty hearing. Our case law demonstrates that Detective Hose was qualified to give this testimony. *See Commonwealth v. Allison*, 550 Pa. 4, 703 A.2d 16, 18 (1997) (holding that lay witnesses are permitted to testify to the apparent physical condition or appearance of another). Detective Hose also testified to the staged position of Ascensio's body at the guilt phase of trial. N.T., 01/14/2000, 755–56. Appellant's counsel objected on the basis that the testimony was beyond Detective Hose's expertise, and the trial court properly overruled his objection. *Id.* at 756. Therefore, counsel also had no reason to renew his objection to this testimony at the penalty phase. Further, Detective Hose provided a foundation for his conclu-

sion of a "staged position." He testified that Ascensio's body was found half-dressed, lying on her back with her arms at her sides, her head resting upon a pillow. In our view, the testimony provided sufficient foundation for Detective Hose's conclusion that the body was found in an apparently staged position.

### D. Noel Montalvo's Criminal Record

Appellant next argues that trial counsel was ineffective for failing to establish a foundation to introduce evidence that Noel Montalvo had a criminal record for violence and drug trafficking. In a related claim, Appellant asserts that counsel was also ineffective in failing to have Noel Montalvo's criminal record authenticated and certified. During the guilt phase, Appellant's counsel attempted to introduce Noel Montalvo's criminal history through Detective Juan Herrera. The Commonwealth objected on several grounds, including relevance, improper foundation, hearsay, prior bad acts, and lack of authentication. The trial court sustained the objection.

As discussed above, the trial court properly excluded similar evidence during the penalty phase as irrelevant. *See, supra,* Op. at 416, n. 10, 986 A.2d at 102, n. 10. In our view, relevance was a proper basis for the trial court to exclude Noel Montalvo's criminal record in both instances. An accomplice's criminal record, absent some connection to the crime, is simply not relevant to the likelihood of another's guilt. Therefore, had trial counsel established a foundation for Noel Montalvo's criminal record and properly authenticated the evidence, the trial court would nevertheless have excluded the evidence. Appellant's claim has no arguable merit.

### E. Testimony on possible sexual assault of Ascensio

Appellant next raises five issues, all of which relate to testimony regarding possible sexual contact Noel Montalvo may have had with Ascensio during, and/or immediately after, the murder. Initially, Appellant argues that trial counsel failed to file a motion in limine to exclude all evidence of

sexual activity. Next, he asserts that counsel was ineffective for failing to object to Dr. Funke's testimony during direct examination that she conducted a rape kit on Ascensio. Appellant also claims that counsel's line of questioning during cross-examination ultimately resulted in Dr. Funke's testifying on redirect that Ascensio could have been penetrated post-mortem. Appellant then asserts that counsel was ineffective for failing "to object or move to strike and request a cautionary instruction" for two aspects of Esther Soto's testimony: 1) her testimony that the prosecutor informed her that Noel Montalvo had sex with Ascensio after the murder; and 2) her testimony that she gave a statement in which she told police that Noel Montalvo said he had sex with Ascensio. Appellant's Brief at 24. Finally, Appellant contends that trial counsel was ineffective for failing to object to portions of the tape recording of Soto's statement regarding Noel Montalvo's sexual activity with Ascensio.

With regard to these claims, Appellant argues that trial counsel had no reasonable basis for his inaction. In response, the Commonwealth notes that this evidence did not implicate Appellant, only his brother Noel. Therefore, according to the Commonwealth, counsel's actions were consistent with Appellant's defense that Noel Montalvo had in fact committed the crimes. The trial court provides the same rationale in its post-evidentiary hearing opinion. We agree with the Commonwealth and the trial court. At the evidentiary hearing, trial counsel testified: "[T]he thrust of the defense was that my client was innocent and that his evil, bastardly brother did this; and I believe there's some testimony somewhere else that the brother admitted to having sex with the victim. So, if that's the case, I would have to say if evidence came in about that, it was consistent with the defense that [Appellant] didn't do it, [Appellant] wasn't even there." N.T., 01/22/2004, P.M., 19–20. Because all of the testimony in question supported Appellant's defense that Noel Montalvo was the actual perpetrator, we find that trial counsel had a rational basis for not objecting to the testimony and was not ineffective.

## F. Detective Roland Camacho's Testimony [11]

Appellant next claims that trial counsel was ineffective for failing to object to Detective Camacho's description of Esther Soto's statement as "detailed" on the grounds that the detective's testimony was an improper opinion that bolstered the credibility of the statement. This claim warrants little discussion. We conclude no reasonable probability exists that the outcome of the proceedings would have been different had counsel objected to the use of this single adjective to describe Soto's statement. *See also, supra,* Op. at 408–09, 986 A.2d at 97–98, regarding allegations of Detective Camacho's improper bolstering of Soto's testimony to which trial counsel did object.

## G. Detective Juan Herrera's Testimony

Appellant also raises five claims of ineffective assistance relating to trial counsel's failure to object to testimony of Detective Juan Herrera of the Miami Police Department regarding Appellant and Noel Montalvo's rental of an apartment in Miami following the murders. Specifically, Appellant argues that counsel was ineffective for failing to object to: 1) "hearsay testimony that [Appellant's] Florida residence was rented in his brother's name using an alias;" 2) "leading and hearsay testimony that the landlord/manager was[, in fact, a landlord,] and his saying that [Appellant], his brother and [his brother's] wife rented an apartment in Miami;" 3) "Detective Herrera's testimony that the apartment lease [sic] was rented on April 20, 1998, based on a receipt he obtained, that testimony being without foundation and hearsay;" and 4) "testimony from Detective Herrera that the landlord was in the hospital and dying." Appellant's Brief at 25. Finally, Appellant argues that trial counsel "elicited, reinforced and opened the door to evidence that [Appellant], his brother and [his brother's] wife rented an apartment in Miami on April 20, 1998, and that the brother used an alias." *Id.*

With regard to the above-listed claims, Appellant argues that the admission of this improper hearsay evidence of joint

11. Appellant sets forth this claim, with identical argument, as both Issue 27 and Issue 34 in his brief. *See, infra,* Op. at 424, n. 12, 986 A.2d at 107, n. 12.

flight supported the Commonwealth's theory of the brothers acting as co-conspirators in the murders. The Commonwealth counters that Appellant suffered no prejudice from the admission of this evidence and we agree. At trial, the jury heard testimony that Appellant stated his intent to commit Ascensio's murder in Noel Montalvo's presence the day before the crime. The jury also heard Soto's tape-recorded statement, which described Appellant's and his brother's confession and statements of their intent to flee to Florida. The jury also heard admissible testimony from Detective Herrera that Appellant was apprehended in Miami. Consequently, the properly admitted evidence demonstrating that Appellant and Noel Montalvo acted as co-conspirators and fled to Florida was sufficiently strong that there is no reasonable probability that the exclusion of Detective Herrera's challenged testimony would have affected the outcome of the proceedings. Moreover, when considering the overwhelming evidence of Appellant's individual guilt, including Appellant being placed at Ascensio's apartment shortly before the murders and the presence of his blood in two locations at the crime scene, we conclude that Appellant has again failed to satisfy the prejudice prong. There is no reasonable probability that the outcome of the proceedings would have been different but for trial counsel's failure to object.

## H. Reasonable Doubt Instruction

Appellant also argues that counsel was ineffective for failing to object to the trial court's jury instruction on reasonable doubt. According to Appellant, trial counsel should have objected when the trial court instructed the jury that reasonable doubt would cause a reasonably careful and sensible person to *pause and* hesitate.[12] According to Appellant, this instruction was an incorrect statement of the law, one that

12. Although Appellant argues this issue solely as it pertains to the penalty phase of trial, Appellant cites three instances—once during the guilt phase and twice during the penalty phase—where the trial court described "reasonable doubt" in this manner. *See* Appellant's Brief at 28 (citing N.T., 01/20/2000 1235; N.T. 01/21/2000, 164, 183–84). Accordingly, we review all instances of the trial court's instructing the jury as to reasonable doubt.

"added elements to the principal [sic] of reasonable doubt making it more likely that the jury would vote" against Appellant. Appellant's Brief at 28.[13]

This Court recently denied relief to a litigant claiming that his trial counsel was ineffective for failing to object to a jury instruction defining reasonable doubt as a doubt which "would cause a reasonably prudent, careful, and sensible person to pause, hesitate, and restrain himself or herself." *Commonwealth v. Cook*, 597 Pa. 572, 952 A.2d 594, 629 (2008). This Court rejected the argument that the trial court's instruction impermissibly lessened the prosecution's burden by raising the level of doubt required for a juror to find reasonable doubt. *Id. Cook* and the cases that precede it, all of which hold that jury charges such as these are acceptable, are controlling here.[14] Consequently, Appellant's claim of ineffective assistance lacks merit.

## I. Closing Arguments

Appellant's final ineffective assistance claims concern the Commonwealth's closing arguments during both the guilt and penalty phases of trial. First, Appellant asserts that, during the guilt phase, trial counsel should have but did not object when the prosecutor stated during his closing argument: "Don't fall for a lot of smoke." N.T., 01/19/2000, 1218. Second, Appellant claims that trial counsel was also ineffective for failing to object to certain closing statements made by the prosecutor during the penalty phase. Specifically, Appellant contends that his trial counsel should have objected when the prosecutor argued to the jury:

13. For the "correct" definition of reasonable doubt, Appellant points to Pennsylvania's Standard Jury Instruction," which provides that a "reasonable doubt is a doubt that would cause a reasonably careful and sensible person to hesitate before acting upon a matter of importance in his own affairs." Pa. Suggested Standard Criminal Jury Instruction 7.01(3) (2008).

14. *See, e.g., Commonwealth v. Marshall*, 570 Pa. 545, 810 A.2d 1211, 1225 (2002) (Opinion Announcing the Judgment of the Court) (collecting cases).

Was this crime especially heinous, unnecessary, atrocious? They could have killed [Ascensio] quickly. The Defendant, who grew up on a sausage farm with pigs and worked in that sausage company and had shown by how he dispatched [Lugo] how efficiently he could do that dispatching living things quickly and efficiently, he didn't do that to [Ascensio.]

N.T. 01/21/2000, 133.

This Court has stated:

A prosecutor has reasonable latitude during his closing argument to advocate his case, respond to arguments of opposing counsel, and fairly present the Commonwealth's version of the evidence to the jury. *Commonwealth v. Abu–Jamal*, 553 Pa. 485, 720 A.2d 79, 110 (1998). A challenged statement by a prosecutor must be evaluated in the context in which it was made. *Commonwealth v. Hall*, 549 Pa. 269, 701 A.2d 190, 198 (1997). Not every intemperate or improper remark mandates the granting of a new trial. *Commonwealth v. Stoltzfus*, 462 Pa. 43, 337 A.2d 873 (1975). Reversible error occurs only when the unavoidable effect of the challenged comments would prejudice the jurors and form in their minds a fixed bias and hostility toward the defendant such that the jurors could not weigh the evidence and render a true verdict. *Commonwealth v. [Jermont] Cox*, 556 Pa. 368, 728 A.2d 923, 931 (1999).

*Cooper*, 941 A.2d at 668 (parallel citations omitted). Additionally, it is well established that a prosecutor's statements "are unobjectionable if they . . . represent mere oratorical flair." *Commonwealth v. Tedford*, 598 Pa. 639, 960 A.2d 1, 33 (2008).

With regard to the prosecutor's closing arguments during the guilt phase, *Commonwealth v. Rucci*, 543 Pa. 261, 670 A.2d 1129, 1142 (1996), is controlling. There, this Court held that the Commonwealth's closing argument references to defense "smoke screens" were not sufficiently prejudicial to warrant relief. Here too, trial counsel's failure to object to the prosecutor's single statement to the jury, admonishing

them not to "fall for a lot of smoke," does not entitle Appellant to relief.

With regard to the Commonwealth's closing argument during the penalty phase, Appellant claims that the prosecutor intended for the jury to infer that Appellant had experience slaughtering pigs while the record demonstrates only that Appellant grew up on a farm where his family made sausage. Further, Appellant asserts that the prosecutor "so much as said that [Appellant] was a natural born killer, not even treating the victim as he would a sow who wallowed in mud." Appellant's Brief at 27. The Commonwealth, conversely, argues that the prosecutor tied Appellant's ability "to kill things quickly and efficiently to the death of [Lugo], not to the experience of slaughtering pigs," Appellee's Brief at 32, and that Appellant suffered no prejudice from this statement.

We conclude that the prosecutor's remarks were reasonable, and certainly did not exceed the bounds of oratorical flair. However, even assuming *arguendo* that the prosecutor's comments in these particular instances were inappropriate, we agree that Appellant cannot demonstrate prejudice. In addition to Dr. Funke's compelling testimony, the Commonwealth's closing remarks focused on the ample evidence demonstrating that "Ascensio was unnecessarily brutalized," especially when compared to the manner in which Lugo was killed. N.T., 01/21/2000, 133. Therefore, we do not conclude that a reasonable probability exists that the outcome of the proceedings would have been different had this singular comment not been made.

## VIII. *After-discovered evidence*

Appellant's final claim is that DNA evidence of an unknown third party, which was found on a condom in a trash can at the crime scene and which was discovered after Appellant's conviction, is after-discovered evidence that warrants a new trial. During the investigation of the crime scene, police found a condom located in the bottom of a trash can. Forensics scientists were unable to detect the presence of semen at that time. Years later, during the trial of Noel Montalvo,

following the development of newer and more sensitive methods for the detection of DNA, a re-test of the condom revealed samples of DNA matching Lugo, Ascensio, and an unknown third party. No samples matched either Appellant or Noel Montalvo. Appellant argues that this evidence is consistent with his theory that the murders were committed by Noel Montalvo and/or another person.

This Court recently described the standard for after-discovered evidence:

> To obtain relief based on after-discovered evidence, appellant must demonstrate that the evidence: (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted.

*Commonwealth v. Pagan*, 597 Pa. 69, 950 A.2d 270, 292 (2008).

At trial, overwhelming evidence implicating Appellant was adduced. This evidence includes but is not limited to Appellant's statement—made just hours before the murders—that he would kill his wife, neighbors who placed Appellant at the scene shortly before Ascensio was heard asking for police, the presence of Appellant's blood at the crime scene, and Appellant's admission of guilt in the presence of Esther Soto. Further, the value of DNA evidence from a condom found at the bottom of a trashcan in Ascensio's apartment is questionable. At the trial of Noel Montalvo, a forensic scientist testified that the unknown DNA was a minor component of the DNA found on the condom, and that this minor component could quite possibly have come from other items that were also in the trash can. Testimony of Beth Ann Giles, Noel Montalvo's trial, at 156–57.[15] Therefore, we conclude that introduction of this evidence would not likely result in a different verdict if a new trial were granted and hence Appellant is not entitled to relief.

15. At the evidentiary hearing, the trial court incorporated the testimony from Noel Montalvo's trial into the record of the case *sub judice*. N.T., 10/05/2005, at 3.

## IX. *Torture Aggravator and Review of Death Sentence*

■ We next consider Appellant's claim that both "the weight and sufficiency of the evidence did not permit a finding of torture [a death penalty aggravator found by the jury] because Ascensio's . . . suffering [and] pain was [sic] speculative since it could not be determined when she lost consciousness or died." [16] Appellant's Brief at 16. Relying upon Dr. Funke, who testified that it was possible Ascensio lost consciousness early in the attack, Appellant asserts that the Commonwealth failed to demonstrate that Appellant intentionally inflicted pain and suffering during Ascensio's murder.

This Court recently discussed the standard for the torture aggravator, Section 9711(d)(8) of the Sentencing Code, in *Commonwealth v. Powell:*

> To establish that a murder was committed by means of torture, the Commonwealth must show that the defendant "intentionally inflicted . . . a considerable amount of pain and suffering that was unnecessarily heinous, atrocious, or cruel, manifesting exceptional depravity." *Commonwealth v. Karenbauer,* 552 Pa. 420, 715 A.2d 1086, 1099 (1998), *cert. denied,* 526 U.S. 1021, 119 S.Ct. 1258, 143 L.Ed.2d 354 (1999)[. S]*ee also Commonwealth v. [Russell] Cox,* 546 Pa. 515, 686 A.2d 1279, 1289 (1996), *cert. denied,* 522 U.S. 999, 118 S.Ct. 567, 139 L.Ed.2d 407 (1997); *Commonwealth v. Thomas,* 522 Pa. 256, 561 A.2d 699, 709 (1989). "Implicit in subsection 8 is the requirement of an intent to cause pain and suffering in addition to the intent to kill." *Karenbauer,* 715 A.2d at 1099 (internal quotation marks omitted). The intent to torture may be proven from the circumstances surrounding the killing. *[Russell] Cox,* 686 A.2d at 1289. This Court has listed the factors to be considered in determining whether the torture aggravator applies as including, but not limited to: (1) the manner in which the murder was accomplished, including the number and type of wounds inflicted; (2) whether the wounds were inflicted on a vital or

16. Appellant did not separate his sufficiency claim from this weight claim regarding torture and, with respect to these issues, Appellant presented a single argument.

non-vital area of the body; (3) whether the victim was conscious when the wounds were received; and (4) the duration of the episode. *Commonwealth v. Ockenhouse,* 562 Pa. 481, 756 A.2d 1130, 1137 (2000). In reviewing a jury's finding of torture, this Court examines the evidence in the light most favorable to the Commonwealth, and draws all reasonable inferences in its favor. *Commonwealth v. Roger Peter Buehl,* 510 Pa. 363, 508 A.2d 1167, 1181 (1986). 598 Pa. 224, 956 A.2d 406, 425 (2008) (parallel citations omitted).

Dr. Funke testified that Ascensio suffered a minimum of four blows to the head with a blunt object, which caused deep wounds to her head and multiple fractures of her skull. Additionally, Ascensio had defensive wounds on her hands and arms that were consistent with a force from a blunt object. Dr. Funke testified further that, before she perished, Ascensio suffered a puncture wound to her eye. The doctor found a minimum of three superficial wounds on Ascensio's neck which, in her expert opinion, were caused by a knifepoint or other sharp object merely to produce bleeding. Ascensio ultimately perished from a minimum of five deep incised wounds on the sides of her neck. These cuts completely severed both of Ascensio's jugular veins and her carotid artery on the left side. Dr. Funke discovered that the cuts on the left side of Ascensio's neck went so deep as to incise and fracture Ascensio's spine. These neck wounds caused severe blood loss and death within minutes. Dr. Funke was able to conclude that all of Ascensio's injuries occurred while she was alive and testified that all of these injuries would have been painful for Ascensio. Although Dr. Funke stated that the blows to Ascensio's head may have caused unconsciousness, the doctor testified that it was possible Ascensio was conscious during the attack, and therefore experienced the pain of all of her injuries. In light of this testimony, we conclude that the jury's finding of torture was supported by both sufficient evidence and the weight of the evidence.

Finally, we turn to our statutory duty to review a sentence of death. Pursuant to 42 Pa.C.S. § 9711(h)(3), this Court

must affirm a death sentence unless we determine that 1) "the evidence fails to support the finding of at least one aggravating circumstance," or 2) the sentence was "the product of passion, prejudice or any other arbitrary factor." As discussed above, the evidence adduced at trial supports the jury's finding of torture in the Ascensio killing. Moreover, the record also straightforwardly supports an aggravating circumstance in Appellant's murder of Lugo: that Appellant had "been convicted of another murder committed in any jurisdiction and committed either before or at the time of the offense at issue," 42 Pa.C.S. § 9711(d)(11). The record here also amply supports the jury's finding that both Ascensio and Lugo were killed in perpetration of a burglary. *Id.* § 9711(d)(6). Further, our review of the record does not indicate that the jury's verdict resulted from an improper factor.

## CONCLUSION

For all the foregoing reasons, we affirm the judgment of sentence.[17]

Chief Justice CASTILLE and Justices EAKIN, BAER, TODD, and McCAFFERY join the opinion.

Chief Justice CASTILLE files a concurring opinion.

Justice SAYLOR files a concurring opinion.

Chief Justice CASTILLE, concurring.

I join the Majority Opinion. I write to make one point of elaboration.

The Majority deems appellant's prolix claims of ineffective assistance of counsel reviewable on this direct capital appeal on the basis of *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 853–55 (2003). Majority Op. at 398 & n. 5, 986 A.2d at 91 & n. 5. This case is unlike *Bomar* in that this appeal did not present itself to us initially as one with a fully-developed

---

17. Pursuant to 42 Pa.C.S. § 9711(i), we direct the Prothonotary of the Supreme Court of Pennsylvania to transmit the complete record of this case to the Governor of Pennsylvania.

trial court record and post-verdict findings on the claims of ineffectiveness of counsel. Instead, the reason for the full hybrid record is that this Court, over my objection, granted a pre-briefing remand of the case some eleven months before the decision in *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726, 738 (2002), which held that claims of ineffective assistance of trial counsel should be deferred to collateral review. The unexplained remand for hybrid review (while *Grant* itself was pending) arguably was defensible under the rule of *Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687 (1977). *Hubbard* had held that: "ineffectiveness of prior counsel must be raised as an issue at the earliest stage in the proceedings at which the counsel whose effectiveness is being challenged no longer represents the defendant" or else the claim is not properly preserved for appellate review. *Id.* at 695 n. 6. *Hubbard* was overruled by *Grant*, and the remand in this case proved to be inconsistent with *Grant's* later directive that: "[t]he rule we announce today will be applied to the parties before us as well as to any other cases on direct appeal where the issue of ineffectiveness was properly raised and preserved." 813 A.2d at 738. Review is proper only because of the subsequent decision in *Bomar*.

As I made clear in my recent concurrence in *Commonwealth v. Liston*, 977 A.2d 1089 (Pa.2009)—and in this regard I spoke for a majority of the *Liston* Court [1]—going forward, the lower courts should not indulge hybrid review by invoking *Bomar*:

I would go farther than the Majority, however, and consistently with [*Commonwealth v.*] *Wright*, [599 Pa. 270, 961 A.2d 119 (2008),] I would explicitly limit *Bomar* to *Hubbard*-era cases, and make clear that there is no "*Bomar* exception" to *Grant*. The Superior Court's opinion in this case, which applies *Bomar* to a new set of facts and, thus, extends its reach, exemplifies an unintended and unauthorized con-

1. Madame Justice Greenspan authored the Majority Opinion in *Liston*; I authored a largely-joining concurrence which was joined by Mr. Justice Saylor and Mr. Justice Eakin; and Mr. Justice Baer authored a separate concurrence. Madame Justice Todd and Mr. Justice McCaffery did not participate in the case.

sequence arising from *Bomar's* continued application in the post-*Grant* setting and fails to take into account this Court's shift away from *Hubbard*-era unitary review and the concerns previously discussed. I have also recognized that unitary review may be appropriate under limited circumstances in order to provide the immediate vindication of a clear claim and noted that there is no such current system in place allowing for such a procedure. *[Commonwealth v. ]Rega,* [593 Pa. 659] 933 A.2d [997,] 1033 [ (2007) (Castille, J., joined by Saylor, J., concurring) ]. Consistently with this Court's approval in *Wright,* however, I would permit hybrid review only when the request for such review is accompanied by an express, knowing and voluntary waiver of further PCRA review. Unless and until we take such steps, we will not be able to give this Court's corrective decision in *Grant* its full effect consistently with the terms of the PCRA. *Liston,* 977 A.2d at 1100 (Castille, C.J., joined by Saylor and Eakin, JJ., concurring).

I join the Majority Opinion.

Justice SAYLOR, concurring.

I join Parts I, II, III, VI, and IX of the majority opinion and write to the following.

As to Part IV, and concerning the admissibility of evidence of a knife and axe found in Appellant's possession, the trial court appears to have read this Court's decision in *Commonwealth v. Williams,* 537 Pa. 1, 20, 640 A.2d 1251, 1260 (1994), as foreclosing, in the weapons-evidence context, the generally prevailing duty of a trial court to balance the probative value of evidence against its potential for unfair prejudice under Pennsylvania Rule of Evidence 403, upon appropriate challenge. *See* Trial Court Opinion, *slip op.* at 8–9. Other courts, however, have not read *Williams* as obviating Rule 403 balancing. *See, e.g., Commonwealth v. Owens,* 929 A.2d 1187, 1191 (Pa.Super.2007) (relying upon *Williams* in a weapons-evidence context, while nevertheless undertaking Rule 403 balancing); *Commonwealth v. Broaster,* 863 A.2d 588, 592–93 (Pa.Super.2004). In this regard, significantly, the federal

analogue to Rule 403 has been characterized as an important safeguard to a criminal defendant's due process right to a fair trial, at least in other evidentiary contexts. *See, e.g., United States v. Enjady,* 134 F.3d 1427, 1432–33 (10th Cir.1998) (finding the federal evidentiary rule governing evidence of similar crimes in sexual assault cases consistent with due process in light of the availability of a balancing of probative value versus prejudicial impact under the federal analogue to Rule 403). Thus, I would take this opportunity to clarify that Rule 403 should apply to weapons evidence, as it does to the broadest category of all other evidence. Furthermore, since the trial court failed to apply Rule 403 balancing upon Appellant's request, I believe the outcome of his present claim should turn on a harmless error assessment.

Also pertaining to Part IV, I am not in full agreement with the statement that, "The criminal record of an accomplice alone is simply not relevant to a defendant's guilt or innocence." Majority Opinion at 409, 986 A.2d at 97; *see also id.* at 421, 986 A.2d at 105. For policy reasons, admissibility barriers have been erected to the use of propensity evidence; however, I differ with the categorical assertion that such evidence necessarily lacks relevance either to a defendant's potential criminal culpability, or to that of another.

As to Part V, which concerns the trial court's denial of Appellant's requests for particular jury instructions, the majority does not reference a material aspect of the governing standard of review—in determining whether a particular instruction is required, the Court is obliged to view the facts in the light most favorable to the defendant. *See Commonwealth v. Robinson,* 554 Pa. 293, 310–11, 721 A.2d 344, 353 (1998). The majority, however, appears to do the opposite. For example, although Commonwealth witness Esther Soto disavowed a pre-trial statement, indicating at trial that she never heard Appellant threaten to kill his wife or admit to the killing, the majority couches the evidence in the light most favorable to the Commonwealth by disregarding Ms. Soto's trial testimony and crediting her pre-trial statement. *See*

Majority Opinion, at 411–12, 412–13, 986 A.2d at 99–100, 100–01.[1] As the trial court applied the same approach, *see* Trial Court Opinion, *slip op.* at 15–17, I believe its rulings were in error, and the disposition of the jury-instruction claims should depend upon the outcome of a harmless error and/or prejudice assessment.

In particular, on the issue of whether a voluntary manslaughter instruction was required upon Appellant's request, I would note that some other jurisdictions appear to be more favorable to requiring the instruction in cases in which there is at least some evidence of a spouse encountering an act of martial infidelity. *See, e.g., Tripp v. State,* 36 Md.App. 459, 374 A.2d 384, 392 (1977) ("It is hornbook law that if one spouse discovers another in an unexpected act of adultery, a killing of spouse or paramour in hot-blooded fury may lower the blameworthiness from the murder level to the manslaughter level.") (quoting *Bartram v. State,* 33 Md.App. 115, 364 A.2d 1119, 1153–54 (1976)). Other jurisdictions, however, have been more conservative in terms of requiring the instruction, particularly where the defendant-spouse has no legal right to be on the premises where a killing occurs. *See, e.g., State v. McClanahan,* 254 Kan. 104, 865 P.2d 1021, 1029 (1993).

In my view, the decision in this case as to the propriety of the trial court's refusal to issue a voluntary manslaughter instruction should depend on a close analysis of all the facts taken in the light most favorable to Appellant, as opposed to a post-hoc, appellate-level crediting of aspects of the Commonwealth's case which were factually disputed.[2] I also believe that, in close cases, it would be preferable to simply issue the instructions explaining what the law is, thus allowing the jury to determine the relevant facts within the guiding legal frame-

1. For purposes of this issue, I follow the majority's approach of characterizing Appellant and the victim as husband and wife. The record appears to me to be unclear as to their actual legal status—according to the Commonwealth, Appellant and the victim had been in a common-law marital relationship. *See, e.g.,* N.T., January 13, 2000, at 457.

2. Indeed, the majority's approach is in apparent conflict with its recognition that it is reviewing the trial court's rulings as of the time they were made, and not against the overlay of subsequent developments. *See* Majority Opinion, at 404 n. 7, 986 A.2d at 94 n. 7.

work, as opposed to taking the decision away from the finder of fact. I am in a concurring posture on this claim, although I regard it as being a close one, only in light of the uncontradicted evidence that Appellant had been excluded from the victim's apartment for approximately one month prior to the killings. *See, e.g.*, N.T., January 13, 2000, at 455, 458–59, 461–62.

Regarding the claims of ineffective assistance of trial counsel, I note in the first instance that such claims are very briefly stated in Appellant's brief. Candidly, I am unable to distinguish Appellant's treatment of various of the issues from other instances in which the Court has found claims of deficient stewardship to be waived due to inadequate development, and I have indicated my belief elsewhere that the Court has an ongoing difficulty with consistency in this area which should be specifically addressed and remedied.

Finally, the majority invokes *Commonwealth v. Bomar,* 573 Pa. 426, 826 A.2d 831 (2003), to justify review of claims of ineffective assistance of counsel on direct review. *See* Majority Opinion, at 398–99 n. 5, 986 A.2d at 91 n. 5. The scope of *Bomar,* however, has been a subject of recent discussion in the cases. *See Commonwealth v. Liston,* 602 Pa. 10, 20–31, 977 A.2d 1089, 1095–1101 (2009); *Commonwealth v. Wright,* 599 Pa. 270, 320 n. 22, 961 A.2d 119, 148 n. 22 (2008). I support the majority's decision to consider the claims of deficient stewardship presented here, at least in the first instance, solely on account of this Court's pre-*Grant* order remanding the case for that specific purpose. It seems to me that such circumstance warrants an independent and discrete exception to *Grant.*