J-S63010-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
Appellee :
:
v. :
:
T.L. :
:
Appellant : No. 3124 EDA 2018

Appeal from the Judgment of Sentence Entered September 20, 2018
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0003991-2017

BEFORE:   GANTMAN, P.J.E., MURRAY, J., and STRASSBURGER, J.[*]

MEMORANDUM BY GANTMAN, P.J.E.:                **FILED JANUARY 17, 2020**

Appellant, T.L., appeals from the judgment of sentence entered in the

Philadelphia County Court of Common Pleas, following his jury trial convictions

for rape, involuntary deviate sexual intercourse ("IDSI") with a child, IDSI

with a person less than 16 years old, incest, unlawful contact with a minor,

and endangering the welfare of a child ("EWOC").[1]  We affirm in part, vacate

in part, and remand with instructions.

In its opinion, the trial court correctly sets forth most of the relevant

facts and procedural history of this case.  Therefore, we have no need to

restate them in full.  Procedurally, we add that the trial court conducted a pre-

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 3121(a)(1), 3123(b), 3123(a)(7), 4302(a), 6318(a)(1), and
4304(a)(1), respectively.

trial status hearing on June 11, 2018, the day before trial began. During the hearing, Appellant challenged the proposed testimony of the Commonwealth's expert witness, Dr. Marita Lind, a pediatrician who had conducted a physical exam of Victim several weeks after Victim had reported Appellant's sexual abuse. Specifically, Appellant claimed Dr. Lind could not testify it was medically possible that Victim had been repeatedly raped, even though her hymen was intact, because: (i) Dr. Lind was unqualified to render that opinion; and (ii) Dr. Lind's expert report did not address the significance of the intact hymen. Appellant also indicated he believed he needed his own expert to oppose Dr. Lind's proposed testimony, but Appellant did not request a continuance to procure a defense expert. On the day trial began, June 12, 2018, Appellant moved to preclude Dr. Lind's proposed expert testimony on the effect of intercourse on the hymen. In the motion, Appellant did not ask for a continuance to obtain his own expert witness on the subject. The court denied Appellant's motion.

At trial, Appellant sought to challenge Victim's credibility by cross-examining her about disciplinary actions her school took against her in the past. In particular, Appellant wanted to introduce and question Victim about school records showing her school had sanctioned her in November 2012 and June 2013. Appellant asserted he had threatened to transfer Victim to a different school in light of the school's disciplinary actions, but Victim did not want to leave her school, so she allegedly fabricated the allegations against

Appellant. The Commonwealth objected to the school records. The trial court sustained the objection, reasoning the school records constituted inadmissible character evidence.

The trial court sentenced Appellant on September 20, 2018, to an aggregate term of twenty-two (22) to forty-four (44) years' incarceration. The court also notified Appellant of his requirement to register and report for life as a "Tier III" sex offender under "Megan's Law."[2]

Appellant raises the following issues for our review:

> WHETHER THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED REVERSIBLE ERROR WHEN THE COURT DENIED [APPELLANT]'S REQUEST FOR A CONTINUANCE OF THE TRIAL SUCH THAT HE MAY HIRE AN EXPERT WITNESS[?]
>
> WHETHER THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED REVERSIBLE ERROR WHEN THE COURT PRECLUDED [APPELLANT] FROM QUESTIONING [VICTIM] ABOUT SPECIFIC INCIDENTS, WHICH ESTABLISHED A MOTIVE FOR [VICTIM] TO FABRICATE THE TESTIMONY[?]
>
> WHETHER THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED REVERSIBLE ERROR WHEN THE COURT DENIED [APPELLANT]'S POST-SENTENCE MOTION, WHICH CHALLENGED THE WEIGHT OF THE EVIDENCE[?]

(Appellant's Brief at 11).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Susan I.

---

[2] The Sexual Offender Assessment Board ("SOAB") concluded Appellant met the criteria of a sexually violent predator ("SVP"), but the trial court did not impose SVP status on Appellant.

Schulman, we conclude Appellant's issues one and three merit no relief. The trial court opinion comprehensively discusses and properly disposes of Appellant's first and third questions presented. (*See* Trial Court Opinion, filed April 17, 2019, at 15-18) (finding: **(1)** in his motion *in limine*, Appellant challenged only substance of Dr. Lind's proposed expert testimony and requested trial court to preclude her expert testimony; Appellant asserts for first time on appeal Dr. Lind's report was untimely and trial court should have granted continuance to allow Appellant time to procure opposing expert testimony, although Appellant did not request continuance; therefore, Appellant's claim is waived; **(3)** Appellant's claim that verdict was contrary to weight of evidence fails; only "conflict" in case was Victim's concern her family would be separated if she reported her father's sexual abuse; Victim's testimony was explicit about her personal "conflict"; jury credited Victim's candid testimony; no basis exists to disturb verdict). The record supports the trial court's rationale. Accordingly, we affirm on the basis of the trial court opinion as to Appellant's first and third issues.

In his second issue, Appellant argues he sought to introduce Victim's school records as part of his defense theory that Victim had a motive to fabricate her accusations against Appellant, not to impeach Victim's credibility. Appellant asserts the trial court incorrectly relied upon ***Commonwealth v. Minich***, 4 A.3d 1063 (Pa.Super. 2010) and Pa.R.E. 608 to bar admission of Victim's school records. Appellant contends the school records constituted

- 4 -

"reverse Rule 404(b) evidence," admissible under Pa.R.E. 404(b)(2). Appellant maintains the trial court's preclusion of the school records violated his right of confrontation.[3]  Appellant concludes this Court should vacate the judgment of sentence and remand for further proceedings.  We disagree.

"The admissibility of evidence is at the discretion of the trial court and only a showing of an abuse of that discretion, and resulting prejudice, constitutes reversible error."  **Commonwealth v. Ballard**, 622 Pa. 177, 197-98, 80 A.3d 380, 392 (2013), *cert. denied*, 573 U.S. 940, 134 S.Ct. 2842, 189 L.Ed.2d 824 (2014).

> The term "discretion" imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion, within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge.  Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions.  Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result

---

[3] Issues not raised in a Rule 1925(b) concise statement of errors will be deemed waived.  **Commonwealth v. Castillo**, 585 Pa. 395, 403, 888 A.2d 775, 780 (2005) (quoting **Commonwealth v. Lord**, 553 Pa. 415, 420, 719 A.2d 306, 309 (1998)).  "Rule 1925(b) waivers may be raised by the appellate court *sua sponte*."  **Commonwealth v. Hill**, 609 Pa. 410, 427, 16 A.3d 484, 494 (2011).  The Rule 1925(b) statement must be "specific enough for the trial court to identify and address the issue [an appellant] wishe[s] to raise on appeal."  **Commonwealth v. Reeves**, 907 A.2d 1, 2 (Pa.Super. 2006), *appeal denied*, 591 Pa. 712, 919 A.2d 956 (2007).  Instantly, Appellant failed to raise in his Rule 1925(b) statement any issue regarding the violation of his right of confrontation.  Thus, to the extent Appellant asserts the trial court violated his right of confrontation when it barred the admission of Victim's school records, that claim is waived for purposes of appellate review.  **See Castillo, supra**.

of partiality, prejudice, bias or ill will.

***Commonwealth v. Goldman***, 70 A.3d 874, 878-79 (Pa.Super. 2013), *appeal denied*, 624 Pa. 672, 85 A.3d 482 (2014).  "To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party."  ***Commonwealth v. Lopez***, 57 A.3d 74, 81 (Pa.Super. 2012), *appeal denied*, 619 Pa. 678, 62 A.3d 379 (2013).

As a general rule:

> Cross-examination may be employed to test a witness' story, to impeach credibility, and to establish the witness' motive for testifying.  A witness may be cross-examined as to any matter tending to show the interest or bias of that witness.  It is particularly important that, where the determination of a defendant's guilt or innocence is dependent upon the credibility of a prosecution witness, an adequate opportunity [must] be afforded to demonstrate through cross-examination that the witness is biased.

***Commonwealth v. Hyland***, 875 A.2d 1175, 1186 (Pa.Super. 2005), *appeal denied*, 586 Pa. 723, 890 A.2d 1057 (2005).

Pennsylvania Rule of Evidence 404 provides in part as follows:

**Rule 404.  Character Evidence; Crimes or Other Acts**

**(a) Character Evidence.**

*(1) Prohibited Uses.*  Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.

*(2) Exceptions for a Defendant or Victim in a Criminal Case.* The following exceptions apply in a criminal case:

*    *    *

(B) subject to limitations imposed by statute a defendant may offer evidence of an alleged victim's pertinent trait, and if the evidence is admitted the prosecutor may:

(i) offer evidence to rebut it; and

(ii) offer evidence of the defendant's same trait; and

\* \* \*

*(3) Exceptions for a Witness.* Evidence of a witness's character may be admitted under Rules 607, 608, and 609.

\* \* \*

**(b) Crimes, Wrongs or Other Acts.**

*(1) Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

*(2) Permitted Uses.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

\* \* \*

Pa.R.E. 404(a)(1), (a)(2)(B), (a)(3), (b)(1-2). Pennsylvania Rule of Evidence 405 states in part as follows:

**Rule 405. Methods of Proving Character**

\* \* \*

**(b) By Specific Instances of Conduct.** Specific instances of conduct are not admissible to prove character or a trait of character, except:

* * *

> (2) In a criminal case, when character or a character trait of an alleged victim is admissible under Pa.R.E. 404(a)(2)(B) the defendant may prove the character or character trait by specific instances of conduct.

Pa.R.E. 405(b)(2). "With regard to criminal cases, under Pa.R.E. 404(a)(2)(B), the accused may offer evidence of a pertinent trait of character of the alleged crime victim." Pa.R.E. 405 *Comment*.

Additionally, "the defense may introduce evidence that someone else committed a crime that bears a highly detailed similarity to the crime with which a defendant is charged." ***Commonwealth v. Patterson***, 625 Pa. 104, 131, 91 A.3d 55, 72 (2014), *cert. denied*, ___ U.S. ___, 135 S.Ct. 1400, 191 L.Ed.2d 373 (2015).

> Criminal defendants are entitled to offer evidence that some other person committed a similar crime at or around the same time they are alleged to have committed a crime. Evidence to establish this fact is admissible after consideration of two distinct factors that coalesce to establish its relevance and probative value. Those factors: are 1) the lapse of time between the commission of the two crimes; and 2) the resemblance between the methodologies of the two crimes. Thus, even if the time lapse between commission of the crimes is brief…, the evidence is not admissible unless the nature of the crimes is so distinctive or unusual as to be like a signature or the handiwork of the same individual.

***Commonwealth v. Palagonia***, 868 A.2d 1212, 1216 (Pa.Super.2005), *appeal denied*, 584 Pa. 675, 880 A.2d 1238 (2005)) (internal citations and quotation marks omitted). ***See also Commonwealth v. Gill***, ___ Pa. ___, ___, 206 A.3d 459, 468-74 (2019) (Wecht, J., concurring) (referring to

evidence admitted under rubric set forth in **_Palagonia, supra_** as "reverse 404(b)" evidence; stating: "'Reverse 404(b)' evidence, as it is has been labeled (or mislabeled) by courts and commentators alike, is evidence of a crime committed by a third party that is similar to the crime for which the defendant stands accused, and that a defendant seeks to admit for the purpose of establishing that the defendant was not the perpetrator of the charged offense") (internal footnotes omitted).

Pennsylvania Rule of Evidence 608 addresses the admissibility of evidence relating to a witness' character for truthfulness or untruthfulness as follows:

> **Rule 608.  A Witness's Character for Truthfulness or Untruthfulness**
>
> \*      \*      \*
>
> **(b) Specific Instances of Conduct.**  Except as provided in Rule 609 (relating to evidence of conviction of crime),
>
> (1)  the character of a witness for truthfulness **may not be** attacked or supported by cross-examination or extrinsic evidence concerning specific instances of the witness' conduct; …
>
> \*      \*      \*

Pa.R.E. 608(b)(1) (emphasis added).  In other words, "Pa.R.E. 608(b)(1) prohibits the use of evidence of specific instances of conduct to support or attack credibility."  Pa.R.E. 608 _Comment_.

In **_Minich_**, this Court analyzed the intersection and applicability of Rules of Evidence 404(a)(2), 405, and 608, where a criminal defendant seeks to

- 9 -

introduce character evidence against a victim who offered testimony against the defendant:

> [W]hile Pa.R.E. 608 addresses only one character trait (truthfulness or untruthfulness), and prohibits the use of instances of specific conduct to establish the trait, Pa.R.E. 404(a) applies to evidence regarding any "pertinent" character trait and, through the operation of case law codified in Pa.R.E. 405, allows evidence of specific conduct to prove the "pertinent" trait.

*Minich, supra* at 1069-70 (internal footnote omitted) (discussing previous versions of Pa.R.E. 404(a), 405, and 608, provisions of which germane to current appeal remain largely unchanged).

> [A] "pertinent" character trait for purposes of Pa.R.E. 404(a)(2)[] is limited to a character trait of the victim that is relevant to the crime or defense at issue in the case. Therefore, whenever the accused seeks to offer character evidence for purposes of attacking or supporting the credibility of a victim who testifies, the admissibility of such evidence is governed by Pa.R.E. 608 and proof of specific incidents of conduct by either cross-examination or extrinsic evidence is prohibited. To hold otherwise would allow the phrase "pertinent trait of character" in Pa.R.E. 404(a)(2) to modify established case law defining the parameters of permissible evidence to impeach or bolster the credibility of witnesses.
>
> *    *    *
>
> In the present case, the Commonwealth sought to preclude Minich from introducing evidence of specific instances in which the victim of a sexual assault was caught lying in school about matters wholly unrelated to the allegations against Minich. Based upon its broad interpretation of the phrase "pertinent trait of character," the trial court concluded that such evidence was admissible under Pa.R.E. 404(a)(2)[]. In light of our holding, this determination was in error. Minich intends to use this evidence to challenge the victim's credibility. As such, its admissibility is governed

- 10 -

by Pa.R.E. 608. Capturing Pennsylvania law, Pa.R.E. 608 provides that "the character of a witness for truthfulness may not be attacked...by cross-examination or extrinsic evidence concerning specific instances of the witness' conduct." Pa.R.E. 608(b)(1). As this is the precise purpose for which Minich intends to use this evidence, it is not admissible.

*Id.* at 1072- 73 (internal citation to record omitted) (holding Pa.R.E. 608, not Pa.R.E. 404(a)(2), barred admission of school records showing minor victim had cheated and lied in school, where criminal defendant was on trial for sex offenses against minor victim who would testify against defendant at trial; "evidence of specific instances in which the victim of a sexual assault was caught lying in school about matters wholly unrelated to the allegations against [the defendant]," did not exhibit "pertinent trait of character" of victim under Rule 404(a)(2), but went to victim's character for truthfulness under Rule 608; therefore, Rule 608, not Rule 404(a)(2), governed admissibility of victim's school records and barred their admission into evidence).

Instantly, Appellant was charged with multiple sex offenses resulting from his sexual abuse of Victim, his minor daughter, who testified against Appellant at trial. On cross-examination of Victim, Appellant tried to introduce records detailing school disciplinary actions against Victim in 2012 and 2013. Appellant planned to use the school records in his defense that Victim had fabricated the allegations in retaliation because Appellant had threatened to transfer Victim to a different school and she did not want to change schools. The trial court sustained the Commonwealth's objection to the school records

and explained its rationale on the record as follows:

> THE COURT: In regard to [Appellant]'s motion to use the [school] log entries 6/12/13 and 11/19/2012 during cross-examination of [Victim], I am sustaining the Commonwealth's objection and said log entries will not be permitted as far as impeachment of [Victim] during cross-examination.
>
> The holding of [**Minich, supra**] is directly on point where school records were sought to be introduced by way of cross-examination of a victim to challenge that victim's credibility. And based upon **Minich** and analyzing Rule 608 as well as Rule 404, both of which govern this issue, …, the law as the Superior Court has framed it would prevent the character of a witness would hold, rather, that the character of a witness for truthfulness may not be attacked by cross-examination or extrinsic evidence concerning specific instances of the witness' conduct.
>
> So, that is my ruling in regard to these log entries. …

(N.T. Motion, 5/14/18, at 76-77). Contrary to Appellant's assertion, the trial court correctly relied upon Pa.R.E. 608 and **Minich**. **See Goldman, supra**; **Minich, supra**. Additionally, Appellant's characterization of the school records as "reverse 404(b)" evidence is misplaced. **See Gill, supra**; **Palagonia, supra**. The school records did not show some third party had committed sex offenses similar to the offenses charged against Appellant, and Appellant did not intend to admit the school records to show someone else, rather than Appellant, had committed the crimes in this case. **See Gill, supra**; **Palagonia, supra**. Accordingly, Appellant's second issue merits no relief.

Nevertheless, the written sentencing order in this case includes sex

offender conditions, lifetime registration, and compliance with "all Tier III Megan's Law requirements." (**See** Order of Sentence, 9/20/18, at 1.)  This directive is inherently inconsistent, because Megan's Law has no "tiers" but does require lifetime registration for Appellant's conviction for rape.  On the other hand, SORNA has a Tier III lifetime registration with additional requirements, which are not included in Megan's Law.  To the extent Appellant's registration requirements implicate SORNA, recent case law has called into question the validity of applying SORNA registration requirements to offenses committed before the effective date of SORNA (12/20/12).  **See Commonwealth v. Wood**, 208 A.3d 131, 140 (Pa.Super. 2019) (*en banc*) (holding effective date of SORNA controls for purposes of *ex post facto* analysis); **Commonwealth v. Lippincott**, 208 A.3d 143 (Pa.Super. 2019) (*en banc*) (stating same).  Consequently, we elect to review the legality of Appellant's sentence *sua sponte*.  **See Commonwealth v. Randal**, 837 A.2d 1211 (Pa.Super. 2003) (*en banc*) (explaining challenges to illegal sentence may be raised by this Court *sua sponte*, assuming jurisdiction is proper; illegal sentence must be vacated).

Importantly,

> Our Supreme Court declared SORNA unconstitutional, to the extent it violates the *ex post facto* clauses of both the United States and Pennsylvania Constitutions.  [**Commonwealth v. Muniz**, 640 Pa. 699, 164 A.3d 1189 (2017), *cert. denied*, ___ U.S. ___, 138 S.Ct. 925, 200 L.Ed.2d 213 (2018)].  The **Muniz** court determined SORNA's purpose was punitive in effect, despite the General Assembly's stated civil remedial purpose.  SORNA also violates the *ex post facto* clause of

- 13 -

the Pennsylvania Constitution because it places a unique burden on the right to reputation and undermines the finality of sentences by demanding more severe registration requirements. The effective date of SORNA, December 20, 2012, controls for purposes of an *ex post facto* analysis.

\* \* \*

Following **Muniz**…, the Pennsylvania General Assembly enacted legislation to amend SORNA. Act 10 amended several provisions of SORNA, and also added several new sections found at 42 Pa.C.S.A. §§ 9799.42, 9799.51-9799.75. In addition, the Governor of Pennsylvania signed new legislation striking the Act 10 amendments and reenacting several SORNA provisions, effective June 12, 2018. Through Act 10, as amended in Act 29, the General Assembly created Subchapter I, which addresses sexual offenders who committed an offense on or after April 22, 1996, but before December 20, 2012. Subchapter I contains less stringent reporting requirements than Subchapter H, which applies to offenders who committed an offense on or after December 20, 2012.

**Commonwealth v. Alston**, 212 A.3d. 526, 528-29 (Pa.Super. 2019) (footnotes and some internal citations omitted). If the defendant's offenses occurred before and after the effective date of SORNA, then the defendant "is entitled to the lower reporting requirements of Subchapter I, absent a specific finding of **when** the offenses related to the convictions actually occurred." **Id.** at 530 (emphasis added).

Instantly, Appellant committed the sex offenses at issue between 2008 and 2017, which time frame straddles the effective date of SORNA. **See Wood, supra**. When the jury convicted Appellant of rape, IDSI with a child, IDSI with a person less than 16 years old, incest, unlawful contact with a minor, and EWOC, the jury did not find specific dates when Appellant

committed the offenses. Without a specific finding from the chosen factfinder of when the offenses occurred, Appellant is subject to the less stringent reporting requirements of Subchapter I of SORNA. *See Alston, supra*. Accordingly, we affirm the judgment of sentence in part but vacate only that portion of the judgment of sentence regarding Appellant's sex offender registration and reporting requirements. Thus, we remand the case to the trial court to impose the Subchapter I registration and reporting requirements of SORNA and to instruct Appellant on those requirements.

Judgment of sentence affirmed in part and vacated in part solely as to the sex offender registration and reporting requirements; case remanded with instructions. Jurisdiction is relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/17/20

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA        :        CP-51-CR-0003991-2017

        :

VS.        :

        :

T. L.        :        3124 EDA 2018

OPINION

SCHULMAN, S.I., J.

T. L. ("Appellant") has appealed the Court's judgment of conviction and

sentence. The Court submits the following Opinion in accordance with the requirements of

Pa.R.A.P. 1925, and for the reasons set forth herein, recommends that its judgment be affirmed.

I.        PROCEDURAL HISTORY

On June 18, 2018, following a jury trial before this Court, Appellant was convicted of

Rape, Involuntary Deviate Sexual Intercourse (IDSI) with a Child, IDSI with a Victim under 16

years of age, Incest, Unlawful Contact with a Minor, and Endangering the Welfare of a Child.

On September 20, 2018, upon consideration of the presentence investigation report and all

relevant facts and circumstances of this case, the Court sentenced Appellant to an aggregate term

of 22 to 44 years' incarceration.

On September 28, 2018 Appellant filed a post-sentence motion for reconsideration,

which the Court denied on October 2, 2018. On October 22, 2018, Appellant filed a Notice of

Appeal in the Superior Court. On December 20, 2018, following the appointment of new

counsel, the Court ordered Appellant to file a Concise Statement of Errors Complained of on

Appeal in accord with Pa.R.A.P. 1925(b). Per counsel's request, the Court extended the deadline for filing Appellant's Rule 1925(b) Statement until February 28, 2019. Counsel timely filed Appellant's Rule 1925(b) Statement on February 12, 2019.

## II.    FACTUAL HISTORY

At trial, the Commonwealth first presented the testimony of Philadelphia Police Officer Edward Heuser. Officer Heuser testified that on March 31, 2017 at approximately 9:50 p.m., he was on routine patrol when he received a call from Detective Boston asking for assistance in serving a Special Victims Unit (SVU) warrant                                    in Philadelphia. Upon arrival at that location, a female answered the door with two children sitting inside; Appellant was not present. Following a conversation with the female, Detective Boston called Appellant, who stated that he was already at the SVU. Officer Heuser and Detective Boston drove to the SVU, where they encountered Appellant sitting inside a car in the parking lot. Officer Heuser escorted Appellant into the building to start processing paperwork, during which Appellant claimed that his name was " $E. V.$ ". (See N.T. 06/12/18 at 55-61).

The Commonwealth next called the complainant, C.V., to the stand. C.V. testified that she was currently 15 years old and living in a foster home. Prior to foster care, she was living with her father (Appellant), stepmother, and brother, who was six years old. C.V. testified that, starting when she was six years old, her father began touching her private parts over her clothing. He did this on a frequent basis, "almost every day." Her father's touching escalated when she was in fifth grade, on a day she came home with "all good grades" on her report card. Appellant told her that as a reward for her good grades, he had a present for her. When they got home from school, Appellant went to his bedroom and lay on the bed. C.V. asked him what her present was, and Appellant responded that "he was the present". Appellant then removed her school uniform

2

and underwear, and stuck his penis into her vagina. C.V. started yelling and tried to get away, but Appellant punched her in the side of the face and told her to be quiet, to calm down, and that "every girl her age goes through this" with their dad. Appellant held her down and continued penetrating her until he said "white stuff was going to come out". After he finished, Appellant told her to go to the bathroom to clean herself up because they were going to pick up her stepmom from work. C.V. testified that at the time of the attack, she was in shock, confused and in pain. (See N.T. 06/13/18 at 15-32).

C.V. testified that throughout fifth grade, her father continued to do this to her at least two times per week. Also in fifth grade, Appellant began putting his penis in her butt, telling her that she could not get pregnant if the white stuff went in her butt. That same year, he also began using his mouth on her vagina -- not over her clothing but directly on her vagina. (See N.T. 06/13/18 at 32-26).

C.V. testified that Appellant continued to rape her when she was in sixth and seventh grade. Specifically, in addition to the family residence, Appellant would do it to her in his car and at job sites -- anywhere her stepmom was not present. He would make excuses to go to the store for items, take C.V. along and then rape her in the car. On multiple occasions he would drive her to the rear of a Laundromat, where he would take her in the back of the car and rape her. C.V. testified that, whereas in fifth and sixth grade Appellant did this twice per week, in "seventh and eighth grade it happened more often." (See N.T. 06/13/18 at 37-45).

C.V. testified that when she was in sixth grade, she told her close friend, N., about what was going on. N. advised her to tell an adult, but C.V. was scared to do so because her father had warned her that if she told anyone, he would get in trouble and she would be sent to a stranger's home where she would be treated much worse. She also testified that she feared being

3

separated from her little brother, with whom she was very close. C.V. testified that she currently was in a foster home and does not get to see her brother much, which makes her feel badly:

> It makes me feel really bad and makes me feel that it's my fault that it happened.

> \*     \*     \*

> Because if I would have never said anything, I would still be living with my brother and I would get to see him. Instead, now I'm in a foster home and I don't get to see my brother at all.

(See N.T. 06/13/18 at 45-49).

C.V. also testified that Appellant would whip her on the back and thighs with his belt if she tried to resist his advances; when she needed clothes or money for school, he would not provide it for her unless he violated her first. C.V. testified that she tried telling her stepmother, who initially confronted her when she saw marks/ hickies on C.V.'s chest:

> She told me why didn't I tell her anything, why was I keeping my mouth shut, why didn't I tell her.

> Q.     What did you say to her?

> A.     I told her because I was scared and I didn't know what to say or do.

> Q.     Now, after she saw this, did she call the police?

> A.     No.

> Q.     Did this stop? Did your dad stop?

> A.     No.

> Q.     Did anything change?

> A.     No.

> Q.     Did you ever hear whether or not your dad said anything else to her about telling or not telling?

4

A. No. There was a time my step mom told me the reasons why she didn't call the police or anything.

Q. What was the reason?

A. She told me she was scared. She felt threatened [by] my dad....

(See N.T. 06/13/18 at 54-55).

C.V. further testified that when she was in eighth grade, she told her friend, *E.* , about what was happening. She told *E.* that she thought she was pregnant, she was scared, and that she got raped. Initially, she told *E.* that it was her uncle who raped her because she was scared, did not want her dad to get arrested, and she did not want to be placed in a foster home.

*E.* informed her school counselor. Within two to three days, C.V. opened up completely and revealed that it was her father. The school counselor spoke with C.V. about it and asked her if she felt endangered going back home, and she said yes. On the same day, March 31, 2017, two police officers came to the school and escorted her to Philadelphia Children's Alliance (PCA), where she was interviewed and told them everything that happened. Later that day, C.V. was placed in foster care where she has remained ever since. As a result, C.V. no longer has any communications with her father and his family, which was the only family she had. (See N.T. 06/13/18 at 58-69).

The Commonwealth next presented the testimony of Carolina Castrano. Ms. Castrano testified that she is a bilingual forensic interview specialist with PCA -- which is a nonprofit organization that provides a multidisciplinary response to children and teens who may have experienced abuse. PCA is co-located with the SVU of the Philadelphia Police Department and Department of Human Services (DHS), the latter being the department that investigates sex

5

abuse. Ms. Castrano testified that during a forensic interview, she speaks to a child in a room while the investigative team -- typically a police detective and someone from DHS -- watches in a room next door via closed circuit television. The interview, which is video recorded, is designed to be unbiased. Ms. Castrano explained:

> We start our interviews with open-ended questions and then we sort of funnel into more focused questions, depending on what they're telling us. So, we don't introduce any information to the child. If it's something they haven't brought up, we will not talk to them about it. They have to be the one to tell us what's going on.

(See N.T. 06/13/18 at 177).

Ms. Castrano testified that she conducted one such forensic interview with C.V. on March 31, 2017. The interview was incorporated into the "Team Interview Summary Report" along with other components, which she described for the jury. The Commonwealth published the Team Interview Summary Report to, and played the video of the interview for, the jury. (See N.T. 06/13/18 at 178-188; Exhibits "C-10" & "C-11").

Next, the Commonwealth presented the expert testimony of Dr. Marita Lind. Following voir dire, during which Dr. Lind testified to her education and training -- including her clinical experience of seeing 350-400 children for child abuse *per year* (approximately 300 of which are for sexual abuse) -- the Court accepted Dr. Lind as an expert in child abuse pediatrics. Dr. Lind testified that she examined C.V. on April 5, 2017. At the start of the examination, she asked C.V. why she had come in, and C.V. responded "because of her dad." C.V. then provided a history of sexual contact from her father starting at age six, which advanced to vaginal and anal penetration with his penis starting in fifth grade and continuing until the last contact two weeks prior to the exam. C.V. also reported pain from these encounters, contact with seminal fluid, being struck on her face, and missing her period for two months. Additionally, C.V. reported

6

painful urination and vaginal discharge, and expressed concern about suffering from a disease because her stepmother told her that her father had been with prostitutes. C.V. was able to speak clearly while providing the history, but at times would become fearful and anxious, and her legs would shake and she would need to pause. A genital exam was postponed until the following week because C.V. was in the middle of her menstrual period. (See N.T. 06/14/18 at 6-20).

Dr. Lind testified that on April 13, 2017, C.V. returned to her office for a genital exam. Dr. Lind did not obtain a DNA sample because the last sexual contact was several weeks out, and therefore it was not warranted. Upon examination of the vaginal vestibule, she noted that C.V.'s hymen was annular in configuration, fimbriated and estrogenized. Dr. Lind noted that in pre-pubertal girls, the external structures including the hymen are not estrogenized. Dr. Lind explained:

> When you become pubertal, the hymen tissue, which before puberty is very sensitive and thin, becomes thicker and elastic so that it allows for things to enter the vagina. And so, when the [t]issue becomes thicker and elastic with puberty, the shape that was really easy to see prepuberty becomes less to see because the hymen, often there's a lot of tissue there and it -- there's folds and there's petals and there's many edges.
>
> In [C.V.], she had the kind of hymen that was annular so it went around the edge of the opening to the vagina. The edge, instead of being smooth or petal-shaped, was fimbriated. That's a normal kind of hymen. It means there's lots of edges because it's like little fingers all overlining each other. When I examined her, I wasn't able to trace the whole outline of the hymen because I would have had to take a Q-Tip and run up and down each of these little fringes, which, technically, would be difficult.
>
>       *        *        *
>
> Q. Okay. So based on this visualization on your part of her internal and external genitalia, do you have an opinion within a reasonable degree of medical certainty whether or not

7

these findings are consistent with an adult male penis penetrating her vagina?

A.    So in a puberal person, and, specifically, with her examination, there wouldn't be any reason why I couldn't have examined her with a speculum without causing trauma or any reason an object of that size such as a penis couldn't have entered her vagina without trauma at this age.

Q.    Does that mean it's consistent with the history provided by [C.V.]?

A.    It's consistent with the history she provided in that she never described to me that she was having bleeding or required any kind of medical intervention or surgical repair, yes.

Q.    I'd like to speak to you a little bit more generally. Your examination overall, is it fair to say it reveals a lack of trauma?

A.    I didn't see any signs of trauma on my exam.

Q.    I know we talked about the hymen specifically, but, overall, can you give us some idea why there may be a lack of trauma in cases of childhood sexual abuse?

A.    So, most of the time there is no trauma in child sexual abuse. Physical findings in children who experience sexual abuse are rare, and most often there are sexually transmitted diseases. Or if you see a child soon after sexual abuse, you might see some abrasions or bruising or superficial injuries. But the blood supply to that area is really good, and so if you examine the same child that had some abrasions or bruising of the hymen and you re-check them, that examination is most often normal.

So the kinds of trauma that you can see that last over time is the kind of trauma that would be indicative of real damage to the tissue that would then result in healing and scarring, and we don't see that very often. It's only about once or twice a year that I have a child that needs to have -- that presents with a kind of bleeding and acute trauma that we might have to arrange to have some suturing or surgical repair of.

8

Q      Is that -- when you see that, is that a case where there is a smaller amount of time between the abuse and when you observe this trauma?

A.      So for the superficial injuries, that is definitely time-dependent, the bruising or abrasions. If the child has experienced a true laceration, especially a laceration internally, like to the vagina or cervix, that isn't going to heal itself easily. The time isn't as important then.

*          *          *

If I see a child immediately after sexual contact, I can often find shallow abrasions especially around the posterior fourchette, which is where the opening of the vagina is, and often some bruising on the hymen. But if I see them 48 or 72 hours later, I cannot find those findings.

*          *          *

Q.      Understood. Doctor, I've handed you a copy of [Exhibit] C-19 titled, "General Anatomy in Pregnant Adolescents: 'Normal' Does Not Mean Nothing Happened."

Are you familiar with this study, Dr. Lind?

A.      I am.

Q.      Can you tell us in general what is the finding of this study?

A.      This is a study that looked at 36 pregnant adolescents and only two of them had physical findings of penetration.

Q.      And in your personal experience, have you seen cases that would be similar to this where you have a pregnant adolescent yet there's still a lack of physical finding of penetration?

A.      Unfortunately, yes. I missed a pregnancy once in a young girl who was 11. There was a really vague complaint or concern about sexual contact. She denied the sexual contact and I didn't do a pregnancy test on her because her exam was

9

completely normal, and she was pregnant. So, yeah, I have seen that happen.

Q. So findings such as the examination, what it revealed about [C.V.]'s hymen, a hymen such as [C.V.]'s, would that be consistent with somebody who was pregnant, could they have a hymen in that condition?

A. I'm sure there are many people pregnant who have a hymen such as [C.V.]'s. It's a normal, mature genitalia.

Q. And there is, I believe, sort of a commonly held belief among the general public that when somebody has sex for the first time, loses their virginity, that a hymen is going to tear, and there's blood and the hymen is gone; is that correct based on true medical evidence?

A. No. The idea of "popping the cherry" or whatever other slang or terms there are for taking virginity are really not technically correct. People who have first-time sex can have bleeding because of trauma to the hymen and then people who have first-time sex cannot have bleeding [at all]. And --

[DEFENSE COUNSEL]:     Cannot have what?

THE WITNESS:     Bleeding.

[ASSISTANT DISTRICT ATTORNEY]:

Q. So it [is] a normal finding that a hymen is not supposed to go away, it will remain with you despite what your sexual history may be?

A. Yeah. I think that over time, especially after delivering babies, the hymen gets thinner. And the hymen, as it experiences trauma, may change or become less, but having sexual intercourse does not make your hymen fall off. People don't generally pick up their hymen after they have sexual intercourse. They sometimes have bleeding they need to wipe up.

(See N.T. 06/14/18 at 21-34).

The Commonwealth next called  S. G.    to the stand.    S. G.   testified

that she is the principal of C.V.'s school.                               As principal,

10

S. G. is a "mandated reporter" in cases of suspected abuse. If she is made aware of a concern, she normally goes to the school counselor to discuss the concern. In March 2017, a parent of one of C.V.'s classmates contacted her with regard to C.V. not feeling safe at home.

J. G. discussed the matter with the school counselor, J. McC., and after speaking with C.V., they reported the suspected sexual abuse to PCA. S. G. noted that C.V. initially indicated that she was being sexually abused by "someone her stepmother was seeing," but she subsequently clarified that it was her father. (See N.T. 06/15/18 at 6-13).

Next, the Commonwealth presented the testimony of. J. McC. J. McC. testified that in March 2017, she was employed as a school counselor at C. V.'s School. During that month, S. G. apprised her of some concerns with C.V. J. McC. met with C.V. to get the gist of the concern, and C.V. was "very upset and afraid" because "she didn't want to be taken away from the brother... [and] afraid of, I think, her family's status within the United States in terms of citizenship." C.V. initially reported through her friend, E. , that it was her uncle, but within a day or two C.V. reported in person that it was her father who raped her, and she was very upset about it. J. McC. provided the above information to Detective Boston of the Philadelphia Police Department. (See N.T. 06/15/18 at 20-29).

Finally, the Commonwealth called Jazmine Torres Valentin to the stand. Ms. Valentin testified that she is a social worker with Philadelphia DHS, and was involved in C.V.'s case in March and April 2017. Ms. Valentin testified that the initial report she received was for "inappropriate discipline", but that report changed to sexual abuse, which was customary in such cases as more information is gathered from the child. In this case, C.V. reported that her father "has been raping her continuously over the last three years." Ms. Valentin noted that even after

11

the initial report came in, C.V. reported that Appellant "came back home and tried to violate her." After conducting further investigation, including the PCA interview, DHS sought and obtained an order for protective custody to remove C.V. from the home to ensure her safety. Ms. Valentin noted that C.V.'s brother also was removed from the home. In that regard, after interviewing Appellant, Ms. Valentin recorded the following impression: "Father does not appear to show empathy that [C.V.] is in DHS custody and appears to be only concerned with the fact that [his son] is in DHS custody." (See N.T. 06/15/18 at 45-59).

For his case-in-chief, Appellant first called his longtime partner [C.V.'s "stepmom"], G. L. , to the stand. G. L. testified that she has been living with Appellant for 13 years; she shares a son with Appellant, and Appellant's daughter, C.V., has resided in the home during that time period as well. G. L. testified that Appellant worked seven days per week from 6:30 or 7:00 a.m. until 7:00 p.m., and never came home in between. G. L. took the children to and from school each day except for Wednesdays, which is the one day she worked. On Wednesdays, one of her sisters would transport C.V. and her brother to/ from school. G. L.

testified that at no point did she ever see any inappropriate contact between Appellant and C.V., only a father-daughter relationship. According to G. L. , Appellant never took C.V. to houses that he was working on, although he did take the whole family to job sites from time to time. Additionally, G. L. testified that prior to DHS taking her son and C.V. away, Appellant took C.V.'s cell phone away for getting in trouble at school for calling her boyfriend's

house and telling his mother that she wanted to live there. According to G. L.

C.V. "lies a lot" and previously accused her, G. L. , of hitting C.V. in the stomach and head, but the school saw no proof of that and C.V. was never taken away from the home for that. Nor did G. L. ever see Appellant hit C.V.; rather, C.V. suffers from eczema, which would

12

account for any bruising on her body. G. L. further testified that immediately prior to DHS' involvement, C.V. had been grounded by her father because G. L. found an electronic cigarette in her room. Finally, G. L. testified that if C.V. had ever complained to her about any kind of inappropriate contact from Appellant, she would have called the police, but C.V. never did so. (See N.T. 06/15/18 at 101-126).

On cross-examination, G. L. admitted that she suspected Appellant of cheating on her, so she planted an audio recorder in his car. Those recordings not only captured Appellant talking to other women in the car, but also talking to C.V. alone on numerous instances in the car. On one of these occasions -- which, G. L. testified on direct never, ever occurred -- Appellant can be heard stating to C.V., "I want to get some of that." (See N.T. 06/15/18 at 126-150).

Finally, Appellant took the stand in his own defense. His testimony largely mirrored that of his partner, G. L. More particularly, Appellant testified that he worked all day long, every day, and was never home in the middle of the day. He testified that during the time period in question, he was his own boss and could show up at work any time he liked, but he did not take C.V. to school (which started at 7:30); instead, either G. L. , one of her sisters, or a family friend would take C.V. to school. Appellant also testified that he never put his hands on C.V. -- he never hit her, touched her inappropriately, or had sexual intercourse with her. On the contrary, Appellant testified that he had a healthy father-daughter relationship with C.V., and he was at a total loss as to why she would make up these allegations. As he put it, "That's a question that really she's the one that would have the best answer for that." Appellant asserted that prior to his arrest in this case, C.V. was getting in trouble at school and apparently talking to a boy (whom he knew nothing about). Appellant testified that C.V. contrived these

13

grave allegations because she was a teenager and wanted freedom to hang outside with her girlfriends but he would not let her. (See N.T. 06/15/18 at 154-183).

Upon consideration of all the foregoing evidence, the jury found Appellant guilty of Rape, IDSI with a Child, IDSI with a Victim under 16 years of age, Incest, Unlawful Contact with a Minor, and Endangering the Welfare of a Child. Following a comprehensive pre-sentence investigation, the Court imposed sentence as previously set forth.

## III.    ISSUES ON APPEAL

Appellant sets forth the following issue in his Rule 1925(b) Statement:

1.    This Honorable Court erred and unfairly prejudiced [Appellant] when the Court denied [Appellant's] Motion in Limine in regards to the testimony of the Commonwealth's expert witness, Dr. Marita Lind. According to Trial Counsel's Motion for Reconsideration, eight days before the jury trial in the above-captioned matter, the Commonwealth alerted Trial Counsel about the expert witness at trial. The Commonwealth's untimely disclosure violated Rule 573. Pretrial Discovery and Inspection. *See Pa.R.Crim.P. 573.* The Court erred in failing to grant a continuance such that the Defense would have the opportunity to engage its own expert. *See Commonwealth v. Belani*, 101 A.3d 1156 (Pa. Super. 2014).

2.    This Honorable Court erred and unfairly prejudiced [Appellant] when the Court precluded Trial Counsel from questioning the complaining witness about several instances, which, according to the theory of the Defense, created a motive for the complainant to fabricate her story. *See Notes of Testimony, 06/13/2018* at 75-82. Pursuant to Rule 404(b)(2), the Defense sought to question the complaining witness about the several instances in order to show the complaining witness's bias and motivation to fabricate. *See Pa.R.E. 404(b). Commonwealth v. Minich*, which the Commonwealth cited, is distinguishable. *See Commonwealth v. Minich*, 4 A.3d 1063 (Pa. Super. 2010). The issue in that case was proper inquiry into character evidence, not evidence of other acts (a.k.a. "reverse 404(b)"). *Id.; see also Pa.R.E. 404(b)*.

3.    This Honorable Court erred and unfairly prejudiced [Appellant] when the Court denied [Appellant's] Post-Sentence Motion,

because the verdict was against the weight of the evidence to prove the charges of: [Rape, IDSI with a Child, IDSI with a Victim under 16 years of age, Incest, Unlawful Contact with a Minor, and Endangering the Welfare of a Child]. The Court should have ordered a new trial because the "verdict [was] so contrary to the evidence as to shock one's sense of justice and the award of a new trial [was] imperative so that right may be given another opportunity to prevail." *Commonwealth v. Brown*, 648 A.2d 1177, 1189 (Pa. 1994). The complaining witness's equivocal and contradictory testimony, which was not supported by independent evidence, rendered the testimony neither credible nor reliable.

4. This Honorable Court erred and committed an abuse of discretion when the Court imposed an aggregate sentence of "22 to 44 years confinement." The Court did not weigh the general standards applicable to sentencing found in Section 9721, i.e., the protection of the public; the gravity of the offense in relation to the impact on the victim and the community; and the rehabilitative needs of the defendant. *See 42 Pa.C.S. [§] 9721(b)*. Moreover, [Appellant]'s sentence is unreasonable under the standards supplied by 42 Pa.C.S. [§] 9781(d). *See 42 Pa.C.S. [§] 9781(d)*.

(Appellant's Rule 1925(b) Statement, ¶¶ 1-4).

## IV. DISCUSSION

### 1. Motion *In Limine* to Preclude the Testimony of Dr. Marita Lind

Appellant contends that the Court erred by denying his Motion *In Limine* to Preclude the expert testimony of Dr. Lind. While it is certainly true that Appellant filed a Motion *In Limine* to preclude Dr. Lind's testimony, in said Motion he only challenged the *substance* of Dr. Lind's testimony, not the *timing* of it. In contrast, he now contends for the first time that Dr. Lind's report was untimely and that "[t]he Court erred in failing to grant a continuance such that the Defense would have the opportunity to engage its own expert." The fatal problem with Appellant's claim of course is that he never requested the relief he now contends the Court erroneously failed to confer.

15

In that regard, it is well settled that in order for an issue to be preserved for appeal, it must first be presented to the trial court. See Commonwealth v. Baez, 169 A.3d 35, 41 (Pa. Super. 2017) (citing Commonwealth v. Wanner, 158 A.3d 714, 717 (Pa. Super. 2017) (defendant waived position that there was an affirmative defense to crime "by failing to rise it before the trial"); Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.")). "This requirement bars an appellant from raising a new and different theory of relief for the first time on appeal." Wanner, 158 A.3d at 717 (citation and quotation marks omitted). As such, Appellant's claim is unavailing.

### 2. Evidentiary Rulings on Prior Bad Acts and Motive to Fabricate

Appellant next claims that the Court erred by precluding him from questioning C.V. "about several instances, which, according to the theory of the Defense, created a motive for [C.V.] to fabricate her story." (Appellant's Rule 1925(b) Statement, ¶ 2). This claim is without merit.

Preliminarily, it must be observed that the "[a]dmission of evidence is a matter within the sound discretion of the trial court, and will not be reversed absent a showing that the trial court clearly abused its discretion." See Commonwealth v. Montalvo, 986 A.2d 84, 94 (Pa. 2009) (citation omitted). "Not merely an error in judgment, an abuse of discretion occurs when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence on record." Id.

Here, Appellant's claim -- that the Court denied him the opportunity to delve into C.V.'s motive to fabricate -- is wholly refuted by the record. At trial, Appellant sought to introduce various prior acts of C.V. as evidence of her motive to fabricate. The Court expressly considered each proposed prior act, and issued its ruling with respect to same on the record. More

16

specifically, Appellant sought to introduce C.V.'s school records and general log entries dating as far back to 2012 for impeaching C.V.'s credibility for truthfulness and honesty. The Court declined to admit those records as they dated too far back and were too tenuous to establish a motive to fabricate allegations five years later. (See N.T. 06/13/18 at 72-77). The Court did, however, permit Appellant to introduce various other instances that were close enough in time to go to motive to fabricate, including: C.V.'s phone call to her boyfriend's mother and the repercussions for same (having her phone taken away and Appellant threatening to send her to a private school) (see N.T. 06/13/18 at 77-79); C.V. trying to sneak out of the house to see her boyfriend and the resultant discipline for same (see N.T. 06/13/18 at 81); testimony regarding an electronic cigarette in C.V.'s room resulting in punishment two to three days before the allegations came out (see N.T. 06/13/18 at 81-82). Thus, as reflected by the record and contrary to Appellant's contention, the Court did not deprive him of the opportunity to delve into C.V.'s motive to fabricate. As such, this claim fails.

### 3. Weight of the Evidence Supporting the Jury's Verdict

Next, Appellant claims that he is entitled to a new trial on the basis that the jury's verdict was against the weight of the evidence. For the reasons that follows, this claim fails.

A challenge to the weight of the evidence is addressed to the discretion of the trial court. Commonwealth v. Upshur, 764 A.2d 69, 72 (Pa. Super. 2000). It is within the exclusive province of the trier of fact to assess issues of credibility and accord weight to testimony. See Commonwealth v. Pirela, 580 A.2d 848, 852 (Pa. Super. 1990). The trial court, sitting as fact finder, is free to accept all, part, or none of a witness's testimony. Id. A new trial should not be granted due to a mere conflict in testimony. Commonwealth v. Widmer, 744 A.2d 745, 752 (Pa. 2000). "Additionally, the evidence at trial need not preclude every possibility of innocence, and

17

the fact-finder is free to resolve any doubts regarding a defendant's guilt unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." Commonwealth v. Patterson, 940 A.2d 493, 500 (Pa. Super. 2007). "Stated another way, a court may award a new trial because the verdict is against the weight of the evidence only when the verdict rendered 'is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.'" Upshur at 72.

Instantly, having presided over Appellant's jury trial, the Court is confident that the jury's verdict of guilty was soundly supported by the weight of the evidence. Nonetheless, Appellant's contention -- that the verdict was "so contrary to the evidence" because C.V.'s testimony allegedly was "equivocal and contradictory" -- is unavailing. The only "conflict" in this case stemmed from the fact that Appellant is the biological father of C.V., who as a young teenager did not want to see her family disintegrate, especially with regard to her six-year-old brother. In fact, C.V.'s testimony was explicit in this regard. Indeed, it was entirely understandable for C.V. to take "baby steps" in first reporting the perpetrator as "someone her stepmom was seeing" before clarifying, once she felt safe, that the perpetrator was her father. The jury plainly credited C.V.'s candid testimony, and accordingly, there exists no basis for disturbing its sound verdict.

18

## 4. Discretionary Aspects of Sentence

Finally, Appellant claims that the Court abused its discretion by failing to weigh the pertinent statutory considerations prior to imposing sentence. This claim is refuted by the record.

It is well settled that sentencing is a matter vested in the discretion of the sentencing court and will not be disturbed on appeal absent a manifest abuse of discretion. Commonwealth v. Gribble, 703 A.2d 426, 437 (Pa. 1997). "In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision." Commonwealth v. Rodda, 723 A.2d 212, 214 (Pa. Super. 1999) (en banc) (citations and internal quotations omitted).

> When imposing a sentence, the sentencing court must consider the factors set out in 42 Pa.C.S. § 9721(b), that is, the protection of the public, gravity of offense in relation to impact on victim and community, and rehabilitative needs of defendant, and it must impose an individualized sentence. The sentence should be based on the minimum confinement consistent with the gravity of the offense, the need for public protection, and the defendant's needs for rehabilitation.

Commonwealth v. Ferguson, 893 A.2d 735, 739 (Pa. Super. 2006) (citation omitted).

A reviewing court must accord great weight to the sentencing court's discretion because it is in the best position to view a defendant's character, exhibition of remorse, indifference, and the general nature of the crime. See Commonwealth v. Sierra, 752 A.2d 910, 915 (Pa. Super. 2000); Commonwealth v. Brown, 741 A.2d 726, 735 (Pa. Super. 1999) (en banc).

> Simply stated, the sentencing court sentences flesh-and-blood defendants and the nuances of sentencing decisions are difficult to gauge from the cold transcript used upon appellate review. Moreover, the sentencing court enjoys an institutional advantage to

19

appellate review, bringing to its decisions an expertise, experience, and judgment that should not be lightly disturbed. Even with the advent of the sentencing guidelines,[1] the power of sentencing is a function to be performed by the sentencing court. Thus, rather than cabin the exercise of a sentencing court's discretion, the guidelines merely inform the sentencing decision.

Commonwealth v. Walls, 926 A.2d 957, 961-962 (Pa. 2007) (citations and internal footnote omitted).

Here, the record demonstrates that the Court carefully considered all relevant facts and circumstances, and thoroughly explained its rationale prior to imposing sentence. Specifically, in addition to Appellant's presentence investigation report and the sentencing guidelines, the Court considered: the nature of the offenses and the prolonged period of abuse starting when the C.V. was six years old (see N.T. 09/20/18 at 7); Appellant's prior history -- including the fact that he impregnated C.V.'s biological mother when *she* was 12 years old, and he was arrested for same and deported (see N.T. 09/20/18 at 7-8); Appellant's complete lack of remorse (see N.T. 09/20/18 at 8-9); the profound impact on the victim, his biological daughter (see N.T. 09/20/18 at 10-14); the fact that the Sexual Offender Assessment Board found that Appellant meets the criteria as a Sexually Violent Predator and the danger he poses to the community (see N.T. 09/20/18 at 14); Appellant's age and higher risk of recidivism (see N.T. 09/20/18 at 15); and the severity of the crime (see N.T. 09/20/18 at 16), among other things. (See N.T. 09/20/18 at 3-42.)

Thus, the record demonstrates that the Court duly considered all relevant factors and circumstances prior to imposing a sentence tailored to this particular defendant. As such, Appellant is due no relief.

20

## V. CONCLUSION

Based on the reasons set forth in the foregoing Opinion, this Court's judgment of sentence should be affirmed.

BY THE COURT:

DATE: 4/16/19

SUSAN I. SCHULMAN, J.

21